IN THE SUPREME COURT OF THE STATE OF DELAWARE

JAMES E. COOKE,  §
 §
  Defendant-Below, §  Case Nos:  519, 2012 & 526, 2012
  Appellant, §  Consolidated
 §
 v. §  Court Below:  Superior Court
 §  of the State of Delaware, in
STATE OF DELAWARE, §  and for New Castle County
 §  Cr. ID No. 0506005981
  Plaintiff-Below, §
  Appellee. §
 §

Submitted:  May 7, 2014
Decided:  July 24, 2014


Before **STRINE**, Chief Justice, **HOLLAND**, **BERGER**, and **RIDGELY**, Justices, and **JACOBS**, Justice (Retired),[*] constituting the Court *en Banc*.


Upon appeal from the Superior Court.  **AFFIRMED**.


Anthony A. Figliola, Jr., Esquire, Figliola & Facciolo, Wilmington, Delaware; Peter W. Veith, Esquire, Wilmington, Delaware, Attorneys for Appellant.


Maria T. Knoll, Esquire, Andrew J. Vella, Esquire, Department of Justice, Wilmington, Delaware, Attorneys for Appellee.


**STRINE**, Chief Justice:

---

[*] Sitting by designation under Del. Const. art. IV, § 38 and 29 *Del. C.* § 5610(a)(2).

## I.  INTRODUCTION

James E. Cooke was convicted of, among other things, raping and murdering Lindsey Bonistall, a 20-year-old University of Delaware student.  Cooke now seeks to have the judgment of convictions and the death sentence that were entered against him in the Superior Court vacated and to receive a new trial, or at least a new penalty hearing. Cooke has raised ten claims of error on appeal that defy brief summary.  But what is common to all of Cooke's arguments is that none of them provides a basis for reversing the judgment of convictions and the death sentence that were entered against him.  The Superior Court took painstaking efforts in the face of Cooke's continuous provocations and contemptuous behavior to respect his legitimate constitutional rights and to ensure that he received a fair trial and sentencing.

What is also common to many of Cooke's arguments is that they are grounded in the contention that he should be relieved of punishment because of his own inexcusable and incorrigible conduct.  For example, Cooke's contumacious and disorderly behavior resulted in him forfeiting his right to continue to represent himself at trial.  A criminal defendant may forfeit his constitutional rights by disruptive and unacceptable conduct. The Constitution protects citizens from having our government deprive them of their constitutional rights, but it does not protect a citizen where his own obstreperous conduct impairs his interests.

1

## II. BACKGROUND[1]

On April 30, 2005, Lindsay Bonistall was a 20-year-old student at the University of Delaware. That night, Bonistall went to her friend Nicole Gengaro's dorm room and watched Saturday Night Live with Gengaro, Katie Johnson, and Isabel Whiteneck (née Rivero).[2] When the show ended at 1:00 a.m. on May 1, 2005, Bonistall left, telling her friends that she might stop at a convenience store along the way home to pick up some food because she was hungry.[3] After Bonistall came home, someone broke into the apartment that Bonistall shared with her roommate, Christine Bush.[4] Bush was out of town that weekend. The intruder attacked Bonistall in her bedroom, tied her hands with an iron cord, and shoved a t-shirt into her mouth as a gag.[5] The intruder beat Bonistall, striking her above her eye and on her chin, and raped her.[6] The intruder then knelt on Bonistall's chest and strangled her to death,[7] using another t-shirt that had been tied and knotted around her neck like a ligature.[8]

The intruder scrawled messages on the walls and countertops of the apartment.[9] The intruder wrote "KKK" at multiple locations around the apartment. In the kitchen area, the intruder wrote, "WHITE Power." On a wall in the living room, the intruder

---

[1] These facts are drawn from the Superior Court's sentencing decision, this Court's decision in Cooke's previous appeal, *Cooke v. State*, 977 A.2d 803 (2009), and the record below.
[2] Sentencing Decision, Exhibit B to Cooke's Opening Br. (Sept. 17, 2012) at 21-23.
[3] Sentencing Decision, Exhibit B to Cooke's Opening Br. (Sept. 17, 2012) at 21-23.
[4] App. to the State's Answering Br. at B215-216.
[5] App. to the State's Answering Br. at B154, B168-170, B208.
[6] App. to the State's Answering Br. at B164-166.
[7] App. to the State's Answering Br. at B172-173.
[8] App. to Cooke's Opening Br. at A204, App. to the State's Answering Br. at B168-170.
[9] App. to the State's Answering Br. at B279.

wrote, "We Want Are [sic] weed back" and "Give us Are [sic] drugs back." The intruder also wrote, "More Bodies Are going to be turn in [sic] up Dead."[10]

To eliminate evidence of the crime, the intruder doused Bonistall's body in bleach.[11] The intruder then dragged her body to the bathtub, put it in, covered it with flammable items, and set it on fire.[12] The fire burned until it set off the hallway smoke alarm and other residents began to evacuate the apartment building. The fire department was called at 2:49 a.m. and the Newark volunteer fire department responded.[13] After putting out the fire, the firefighters discovered Bonistall's burned body in the bathtub, still bound and gagged.[14] The Fire Marshal determined that the fire had been intentionally set, and testified that the fire would have had to burn for at least an hour before it was put out to cause the damage it did.[15] An autopsy determined that the cause of Bonistall's death was strangulation, and that Bonistall was dead before the fire was started.[16] In other words, the fire would have been set at around 1:45 a.m. at the latest, meaning that Bonistall was killed less than an hour after she left her friends at around 1:00 a.m.

---

[10] App. to Cooke's Opening Br. at A173-174; App. to the State's Answering Br. at B205-207.
[11] App. to the State's Answering Br. at B160, B210-211.
[12] App. to Cooke's Opening Br. at A539; App. to the State's Answering Br. at B171.
[13] App. to Cooke's Opening Br. at A538; App. to the State's Answering Br. at B280.
[14] App. to Cooke's Opening Br. at A188-190; App. to the State's Answering Br. at B155-162.
[15] App. to Cooke's Opening Br. at A539; Trial Transcript (Mar. 29, 2012), docket 476 (Q. "[C]an you please tell the jury approximately, in your opinion, approximately how long it took that fire to burn before the smoke reached the hallway to set off the hallway alarm? A. I would say probably over an hour . . . maybe even longer . . . ."). Cooke's counsel confirmed the time estimate during cross-examination. Trial Transcript (Mar. 29, 2012), docket 476 ("Q. And you believe . . . the fire may have been burning or smouldering for at least an hour? A. It would almost have to be at least that long . . .").
[16] App. to Cooke's Opening Br. at A204.

Following the murder, an anonymous person who was attempting to disguise his voice made at least three calls to the Newark Police Department's 911 call center. In the first call on May 2, 2005, the caller said that Bonistall's murder was related to two break-ins that had occurred at nearby apartments during the week before Bonistall's murder.[17] The phone call led the Newark Police to investigate connections between Bonistall's murder and the break-ins at the nearby apartments.

The first break-in occurred four days before Bonistall was murdered. Around 1:00 a.m. on April 26, 2005, Cheryl Harmon returned to her apartment. Harmon discovered that someone had written "I WHAT [sic] My drug Money," "DON'T Mess With My Men," and "we'll be back" on the walls of her apartment with red fingernail polish.[18] Harmon noticed that she was missing several DVDs and two personalized rings.[19] The point of entry was a living-room window with a pried-off lock.[20]

The second break-in occurred three days later, on April 29, 2005 — the evening before Bonistall was murdered. Amalia Cuadra woke up in the middle of the night because someone was shining a flashlight in her face. Cuadra called out to see if it was her roommate, and the intruder responded, "Shut the fuck up or I'll kill you" and "I know you have money. Give me your fucking money."[21] Cuadra gave the intruder $45 in cash,

---

[17] App. to the State's Answering Br. at B256-257.
[18] App. to Cooke's Opening Br. at A527-528.
[19] App. to the State's Answering Br. at B229.
[20] App. to the State's Answering Br. at B230-231.
[21] App. to Cooke's Opening Br. at A297-298.

but the intruder said, "Give me your fucking credit cards or I'll kill you."[22] Cuadra gave him an American Express card and a VISA card. The intruder then demanded, "Take off your fucking clothes or I'll kill you."[23] Cuadra screamed for her roommate and dialed 911 on her cell phone. The intruder fled, taking Cuadra's backpack, which had her name on it and contained an iPod and some diet pills in a tin container.[24]

The anonymous caller made two additional calls to the 911 call center on May 7, 2005. In those calls, the anonymous caller gave detailed information about the three crimes, including information that had not been released to the public.[25] The calls convinced the Newark Police that the crimes were linked and had been committed by the same person. Evidence also emerged that focused the investigation on James E. Cooke.

Cooke lived with Rochelle Campbell, his girlfriend and the mother of three of his children. Campbell was pregnant with a fourth child by Cooke at the time.[26] Harmon, Cuadra, and Bonistall's apartments were all within a quarter mile of Cooke's residence and could be seen from his back door.[27] Campbell saw Cooke with the backpack from the Cuadra robbery in the early morning hours of April 30, 2005.[28] Cooke told Campbell that he got the backpack from some college kids who had gotten into a car accident and

---

[22] App. to the State's Answering Br. at B236-239.
[23] App. to the State's Answering Br. at B240-43.
[24] App. to Cooke's Opening Br. at A530-535; App. to the State's Answering Br. at B245-248.
[25] App. to Cooke's Opening Br. at A542-546; App. to the State's Answering Br. at B257, B264.
[26] Cooke has a total of fourteen children by ten different women. Sentencing Decision, Exhibit B to Cooke's Opening Brief (Sept. 17, 2012) at 29, n.22.
[27] App. to the State's Answering Br. at B282-283.
[28] App. to the State's Answering Br. at B265-66.

5

had left it outside their house.[29] Cooke showed Campbell the credit cards and told Campbell that he was going to try to use them. Cooke tried to use Cuadra's VISA card at a nearby ATM, but it did not work because Cuadra had already cancelled the card.[30] Cooke then returned home without the backpack or the credit cards.[31]

But Cuadra's credit card company noticed that someone tried to use her stolen credit cards. The Newark Police retrieved the ATM surveillance video of the person who tried to use the card.[32] Cuadra had described the intruder as a light-skinned black male with bumps or freckles on his face and puffy cheeks.[33] That general description matched Cooke. Cuadra also said the intruder was wearing a gray hoodie, a hat, knitted gloves, and light blue pants.[34] When Cuadra was shown the surveillance video from the ATM, she was fairly sure that it was the intruder,[35] but when the Newark Police showed Cuadra a photo array including Cooke, Cuadra did not pick out Cooke's photo.[36]

The Newark Police used the ATM surveillance video from the Cuadra robbery to create a wanted poster for Bonistall's murderer, which was displayed around Newark, including at the Payless shoe store where Cooke worked part-time.[37] Campbell, Cooke's coworkers from the Payless shoe store, and a woman who recognized Cooke from seeing

---

[29] App. to the State's Answering Br. at B267.
[30] App. to Cooke's Opening Br. at A536; App. to the State's Answering Br. at B249-251, B267, B270.
[31] App. to the State's Answering Br. at B267.
[32] App. to Cooke's Opening Br. at A536-37.
[33] App. to Cooke's Opening Br. at A300.
[34] App. to Cooke's Opening Br. at A300.
[35] App. to Cooke's Opening Br. at A303.
[36] App. to Cooke's Opening Br. at A305.
[37] App. to the State's Answering Br. at B252.

him playing basketball in nearby Dickey Park, all identified Cooke as the man in the posters. They based their identification in part on the distinctive way the man in the poster stood on his toes and the type of gloves he was wearing. Both the distinctive foot position and the gloves were characteristics these witnesses associated with Cooke.[38] The gloves contained small grips on the inside of the hand in a dotted pattern.[39] The same dotted grip pattern from the gloves was found on the balcony railing outside Bonistall's apartment, on a CD cover in her living room, and on her bed sheets.[40] Campbell also later testified that she was 100 percent certain that the voice on all of the 911 calls was Cooke.[41]

Cooke quit his job without notice after the murder, left Newark, and went to Atlantic City.[42] Cooke then committed four more violent crimes, including three home invasions.[43] In one, Cooke entered the apartment through a second floor window, and when the victim woke up she saw Cooke sitting on her bed. Cooke started to choke the victim before taking several of her credit cards and a necklace. As Cooke was leaving, he tugged at the victim's underwear, but then did not go further. The victims from those four crimes identified Cooke as the perpetrator, and Cooke admitted to committing those four crimes.

---

[38] App. to Cooke's Opening Br. at A540-541
[39] App. to the State's Answering Br. at B262.
[40] App. to the State's Answering Br. at B209, B212-213.
[41] App. to Cooke's Opening Br. at A325-327.
[42] App. to the State's Answering Br. at B269.
[43] App. to the State's Answering Br. at B269, B297-304; Sentencing Decision, Exhibit B to Cooke's Opening Brief (Sept. 17, 2012) at 38-41.

Cooke was arrested on June 7, 2005 in connection with the murder of Bonistall. Cooke was then charged with Murder First Degree (2 counts – the second count being felony murder); Rape First Degree; Burglary First Degree; Arson First Degree; Reckless Endangering First Degree; Burglary Second Degree (2 counts); Robbery Second Degree; and Misdemeanor Theft (2 counts). After Cooke was arrested, he was interrogated by Detective Andrew Rubin of the Newark Police Department for four to six hours. Cooke told Detective Rubin that he did not know Bonistall.[44] But when Cooke was arrested at his sister's house, a hoodie was discovered at the house that had Bonistall's hair on it.[45] Investigators analyzed the handwriting of the messages left on the walls in Bonistall's and Harmon's apartments and determined that Cooke could have written both.[46] Investigators analyzed the scrapings recovered from Bonistall's fingernails and determined that they matched Cooke's DNA, as did the sample of semen taken from Bonistall's vagina.[47] After the evidence showed that Cooke had contact with Bonistall, Cooke did a one-eighty. Cooke then said that he not only knew Bonistall, but also claimed that they had smoked marijuana together and had consensual sex on the evening of Friday, April 29, 2005, more than 24 hours before Bonistall's death and the same night Cooke broke into Cuadra's apartment and stole her backpack and credit cards. But Cooke said that he did not kill Bonistall.[48]

---

[44] App. to Cooke's Opening Br. at A365.
[45] App. to the State's Answering Br. at B275.
[46] App. to Cooke's Opening Br. at A285.
[47] App. to Cooke's Opening Br. at A204-206; App. to the State's Answering Br. at B284.
[48] App. to Cooke's Opening Br. at A369-71.

Cooke's first trial began on February 2, 2007. Although Cooke insisted that he was innocent and wished to plead not guilty, Cooke's first set of counsel pursued a defense of guilty but mentally ill. The jury found Cooke guilty of all charges on March 8, 2007, and did not accept the contention that Cooke was mentally ill when he committed the crimes. The jury unanimously recommended death at the penalty phase. The Superior Court sentenced Cooke to death on June 6, 2007.[49] Cooke was then assigned a second set of counsel, who filed an appeal arguing that the guilty but mentally ill plea that was entered over Cooke's objections by Cooke's first set of counsel violated Cooke's constitutional right to direct his own defense and plead not guilty.[50] This Court agreed, and we reversed and remanded the case to the Superior Court for a new trial on August 17, 2009.[51] The new trial was scheduled to begin in February 2011.[52]

The success of Cooke's second set of counsel in obtaining a reversal of his convictions and death sentence did not satisfy him. Cooke filed multiple actions under 42 U.S.C. § 1983 against his second set of counsel and a host of others in December

---

[49] *State v. Cooke*, 2007 WL 2129018 (Del. Super. June 6, 2007).
[50] *See, e.g.*, *Gonzalez v. United States*, 553 U.S. 242, 247 (2008) (right to plead not guilty is a fundamental right that a criminal defendant must waive personally and that an attorney alone cannot waive); *Florida v. Nixon*, 543 U.S. 175, 187 (2004) ("[C]ertain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant . . . has the ultimate authority to determine whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal.") (internal quotations omitted).
[51] *Cooke v. State*, 977 A.2d 803 (Del. 2009) (defense counsel's pursuit of a verdict of guilty but mentally ill despite Cooke's repeated protestations that he was innocent and not mentally ill infringed Cooke's right to plead not guilty, negated Cooke's right to testify in his own defense, deprived Cooke of the right to an impartial jury, and denied Cooke the assistance of counsel).
[52] App. to Cooke's Opening Br. at A41.

2010, alleging violations of his constitutional rights.[53] As a result, the Superior Court granted Cooke's second set of counsel's motion to withdraw, and the trial was rescheduled. Then, due to a Supreme Court Rule change, the case was reassigned to a new Superior Court judge on February 24, 2011.[54]

Cooke's third set of counsel was appointed on March 7, 2011. Cooke, however, became discontented with his third set of counsel too. Therefore, on November 10, 2011, Cooke requested to represent himself. A hearing on that application was held on November 30, 2011. At the hearing, the Superior Court conducted a colloquy with Cooke to ensure that his choice to represent himself was knowing and voluntary. The Superior Court made it clear that if it granted Cooke's request to represent himself, it would not grant a continuance to allow Cooke more time to prepare, because Cooke was already familiar with the evidence against him.[55] After assuring itself that Cooke understood the choice he was making, the Superior Court granted Cooke's request to represent himself. The Superior Court also appointed standby counsel to help Cooke prepare his defense, and directed standby counsel to prepare for trial in case Cooke was no longer able to represent himself or forfeited his right to do so.

---

[53] *See, e.g.*, *Cooke v. Goldstein*, 2011 WL 2119347 (D. Del. May 26, 2011); *Cooke v. Herlihy*, 2011 WL 2119351 (D. Del. May 26, 2011); *Cooke v. Wood*, 2011 WL 1542825 (D. Del. Apr. 21, 2011). Nearly all of Cooke's claims were dismissed as frivolous.

[54] Supreme Court Rule 82(b) was amended on January 6, 2011 to provide that "[i]n a Class A felony tried without a jury or a capital first degree murder case that is reversed and remanded by the Supreme Court to the Superior Court for a new trial or penalty hearing, the President Judge shall assign a different judge to preside over the case."

[55] App. to Cooke's Opening Br. at A107-108, A115-116.

10

Cooke represented himself during the selection of the jury, and then Cooke's second trial began on March 7, 2012. But Cooke would not follow the Superior Court's orders and was repeatedly disruptive and disrespectful. Thus, on March 9, 2012, the third day of the State's case-in-chief, the Superior Court determined that Cooke had forfeited his right to represent himself. After a continuance to give standby counsel more time to prepare, standby counsel took over Cooke's defense and completed the trial. The jury found Cooke guilty of all charges except one charge of misdemeanor theft. At the penalty phase, the jury recommended a sentence of death by a vote of 11-1 as to felony murder and by a vote of 10-2 as to intentional murder. The Superior Court sentenced Cooke to death on September 17, 2012.

## III. ANALYSIS

Cooke has raised ten different claims of error on appeal, which are not organized in his briefs in any thematic way. For the sake of coherence, we analyze Cooke's claims by grouping those raising common themes together. We begin by analyzing Cooke's claims that involve, in various forms, a contention that he was denied the ability to effectively defend himself at trial. We next address Cooke's contentions that the Superior Court's rulings regarding the admissibility of certain evidence were erroneous. We then address Cooke's contention that various issues relating to the jury's composition compromised his right to an impartial jury. We conclude by addressing Cooke's contention that his death sentence fails the proportionality review required by 11 *Del. C.* § 4209(g).

11

## A. Cooke's Contentions That He Was Denied His Constitutional Right To Counsel Are Without Merit

Cooke claims that his constitutional right to counsel was violated in several ways. First, Cooke argues that he was not afforded a fair opportunity to consult with his attorneys and to spend time with the record in his case during his incarceration by the Department of Correction before his second trial. Second, Cooke argues that after his motion to represent himself was granted on November 30, 2011, he was denied the ability to represent himself effectively because the Superior Court did not also grant his request for a continuance, giving him only three months between that ruling and the start of his second trial on March 7, 2012 to prepare his defense. Third, Cooke makes two mutually inconsistent arguments in support of his contention that his constitutional right to representation was denied. In his opening brief, Cooke argues that the Superior Court erred by concluding on the third day of trial that Cooke had forfeited the right to represent himself by engaging in repeated misconduct, and would be represented by standby counsel for the remainder of his trial. In his Reply Brief, Cooke changes position, abandoning his argument that the Superior Court erred by relieving him of the right to represent himself, and arguing instead that the Superior Court erred by failing to do so sooner. In other words, because his own conduct was so egregious, Cooke now contends that the Superior Court should have relieved him of his right to self-representation earlier, and given his standby counsel more time to play the leading role on his behalf. Finally, Cooke argues that his death sentence should be vacated because, in the face of his ambiguous and shifting positions, his standby counsel presented

mitigation evidence to convince the jury to recommend and the Superior Court to give Cooke a life, rather than death sentence at the penalty phase. Although Cooke sought to escape a death sentence, he at times opposed the presentation of mitigation evidence on his behalf. Because standby counsel presented mitigating evidence, Cooke argues that his constitutional right to control his case was violated and that his death sentence should be lifted. We now address these related arguments.

### 1. The State of Delaware Did Not Violate Cooke's Right To Counsel During The Pre-Trial Preparatory Process

Cooke argues that the State of Delaware, in particular the Delaware Department of Correction, interfered with his access to counsel by limiting the time, place, and date of visitation with counsel. Cooke claims that this lack of access caused him to lose trust in his third set of counsel, which is why he decided to represent himself. This Court reviews the alleged violation of a constitutional right *de novo*.[56] A criminal defendant has a right to the effective assistance of counsel. Denying a criminal defendant access to counsel "is a denial of due process of law, under both the federal and Delaware Constitution[s]."[57] But the record demonstrates that the State did not impede Cooke's access to counsel or the preparation of his defense. Instead, the record shows that the State made substantial efforts to facilitate Cooke's ability to prepare for trial, and that any lack of access was attributable to Cooke's own misconduct. To explain why that is so, we detail the key facts regarding this claim.

---

[56] *Bentley v. State*, 930 A.2d 866, 871 (Del. 2007); *Jones v. State*, 940 A.2d 1 (Del. 2007).
[57] *Bailey v. State*, 521 A.2d 1069, 1083 (Del. 1987).

To begin with, it is critical that all of Cooke's denial of representation claims be placed in proper context. Cooke had a key advantage in terms of his ability to prepare for his trial in March 2012, because that was to be his *second* trial. During the first trial in 2007, Cooke saw the State's case against him and amassed large files on his case. Furthermore, given Cooke's situation, he had plenty of time available to ponder his case. Of course, Cooke's decision to fire two sets of counsel was his own and made it necessary for yet another set of counsel to get up to speed. But, that was Cooke's own decision, and successor counsel also had the advantage of the files, prior briefs, and judicial decisions in the matter. This context is critical to understanding the weakness of Cooke's argument regarding his ability to confer with his third set of counsel in advance of his second trial. That feebleness begins to emerge from the early stages of preparation for the second trial.

On March 17, 2010, Cooke's counsel requested that Cooke be moved from the James T. Vaughn Correctional Institution (the "Vaughn Correctional Center") in Smyrna to the Howard R. Young Correctional Institution ("Gander Hill") in Wilmington.[58] The Superior Court granted this request on May 7, 2010, because "it is necessary to place Mr. Cooke in a position where counsel is more readily able to get to him without the restrictions imposed on counsel visits to the Vaughn Correctional Center."[59] Thus, the Superior Court facilitated Cooke's access to counsel. After his transfer, Cooke was placed in the disciplinary unit at Gander Hill; where he had regular access to the key files

---

[58] App. to Cooke's Opening Br. at A41.
[59] App. to Cooke's Opening Br. at A43.

14

regarding his case.[60]  On May 21, 2010, Cooke asked to talk to the warden about moving into general population, but the warden was not available because it was Saturday. Cooke began kicking the door of his cell and screaming.[61]  Officers tried to subdue him, but Cooke continued kicking the door of his cell and screaming.  Disciplinary charges were brought against Cooke as a result of the incident.[62]

Cooke continued to misbehave.  As noted, to facilitate Cooke's ability to prepare for trial, Cooke was allowed to keep a substantial amount of legal files at hand.  But, in September 2010, Cooke and other inmates were seen weight-lifting 40-50 pounds of Cooke's legal mail that had been wrapped in sheets.  That was a violation of prison rules and the mail was confiscated.[63]  In another incident in December 2010, Cooke remained in bed masturbating rather than standing at the front of his cell as required for a head count.  Cooke was found guilty of sexual misconduct by the prison disciplinary system.[64] Cooke claimed that the officer filed a false report and called the hearing officer a racist.[65] Because of these problems at Gander Hill, Cooke himself requested to be transferred back to the Vaughn Correctional Center.  Cooke's *own* request was granted.

But Cooke's behavior did not improve.  In August 2011, Cooke was found guilty of another instance of sexual misconduct when he stood on his toilet and masturbated so

---

[60] App. to the State's Answering Br. at B291.
[61] App. to the State's Answering Br. at B292.
[62] App. to the State's Answering Br. at B293.
[63] App. to the State's Answering Br. at B287-90.
[64] App. to the State's Answering Br. at B293a, B293b.
[65] App. to the State's Answering Br. at B294.

15

he could be seen by a female officer.[66] Due to his disciplinary problems, and for his own protection, Cooke was placed in the Segregated Housing Unit (the "SHU") and not the general population at the Vaughn Correctional Center.[67] Because the SHU houses inmates who pose special dangers because of their conduct and other factors, access to the SHU is understandably more restrictive in order to protect prison staff, other prisoners, visitors, and the public at large.[68] Consistent with that reality, there are corresponding difficulties for attorneys who are representing prisoners housed in the SHU, as compared to prisoners in the general population.[69] On October 20, 2011, Cooke's third set of counsel filed a motion to compel the State to relocate Cooke back to Wilmington, where the trial was being held, to increase their access to him. Despite the fact that Cooke's own behavior earned his assignment to SHU, the Superior Court granted the motion to transfer Cooke back to Gander Hill on November 10, 2011 to facilitate his access to counsel. Notably, Cooke told the Superior Court that he did not want to be transferred.[70] The Superior Court explained that: "[M]y first concern is are you afforded effective assistance of counsel and I've taken the steps to answer a complaint by two experienced counsel that they had difficulties."[71] In response to the

---

[66] App. to the State's Answering Br. at B305-307.

[67] App. to the State's Answering Br. at B8.

[68] *Turner v. Safely*, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests" such as institutional security considerations); *see also State v. Red Dog*, 1993 WL 144866 (Del. Super. Mar. 2, 1993) (applying the standard set in *Turner*).

[69] *See* App. to the State's Answering Br. at B8 (describing the difficulties for an attorney who is advising a client housed in the SHU because of the increased security measures).

[70] App. to Cooke's Opening Br. at A78.

[71] App. to Cooke's Opening Br. at A79.

Superior Court's efforts to assure that his attorneys could prepare the best defense possible for him, Cooke fired his attorneys and insulted the Superior Court.[72]

Despite Cooke's opposition, he was transferred back to Gander Hill on December 5, 2011, ten weeks before jury selection.[73] The Superior Court spoke with the warden and visited Gander Hill to view Cooke's living arrangements and the law library.[74] The Superior Court also issued an order regarding Cooke's conditions of confinement.[75] Cooke was granted access to the law library and the technology needed to review video evidence. The rule limiting the amount of materials that could be kept in Cooke's cell was also waived, despite his prior misuse of legal materials. Cooke was housed alone in a cell that would normally hold three people, so that he would have sufficient space to review the record.[76] Cooke acknowledges that the Superior Court took "appropriate" ameliorative action — by having Cooke transferred to Gander Hill over his objections and by ordering special conditions for his confinement — but Cooke claims that the Superior Court did not take that ameliorative action until "far too long after the damage was administered."[77]

This record makes clear that the State of Delaware did not in any manner impair Cook's ability to have adequate access to his counsel or to files necessary for trial

---

[72] A80 ("[COOKE]: I'm just going to fire them . . . . They fired, period. These attorneys is fired. . . . They fired, because I don't want them. . . . Judge Toliver is not going to rule me. You rule them, you don't rule me. Ha, ha, that's it. THE COURT: Okay -- [COOKE]: I find you to be a slave master and an Uncle Tom at the same time.").

[73] App. to Cooke's Opening Br. at A53.

[74] App. to Cooke's Opening Br. at A109, A120-121.

[75] App. to Cooke's Opening Br. at A52-54.

[76] App. to Cooke's Opening Br. at A120-21.

[77] Cooke's Opening Brief at 52.

preparation.[78]  "Situations involving interference with the assistance of counsel are subject to the general rule that the remedy should be tailored to the injury suffered and should not unnecessarily infringe society's competing interest in the administration of criminal justice."[79]  Here, the record shows that in order to secure Cooke's constitutional rights, the Superior Court, and the Department of Correction at the Superior Court's direction, granted Cooke indulgences that exceeded what he was entitled to in view of his own repeated misconduct.  To the extent that Cooke's time with counsel or files was diminished, his own behavior was the cause.[80]  And, despite Cooke's behavior, the amount of time he was given with counsel and his files was more than sufficient to enable him to present an effective defense.[81]  Thus, Cooke's claim has no merit.

---

[78] *See Turner v. Safely*, 482 U.S. 78, 89 (1987).

[79] *Bailey v. State*, 521 A.2d 1069, 1084 (Del. 1987).

[80] *See Bell v. Wolfish*, 441 U.S. 520, 540 (1979) ("[I]n addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment."); *Pell v. Procunier*, 417 U.S. 817, 827 (1974) ("[Institutional security] considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.").

[81] *Ungar v. Sarafite*, 376 U.S. 575, 589-90 (1964) ("There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."); *see also Jones v. Walker*, 540 F.3d 1277, 1283 (11th Cir. 2008) (affirming life sentence where trial court denied continuance after defendant in murder case fired counsel and elected to proceed *pro se* on August 8 and trial began on August 20, and trial had already been rescheduled twice due to the defendant's conflicts with appointed counsel).

## 2. The Superior Court's Denial Of Cooke's Request For A Continuance Was Not An Abuse Of Discretion

Cooke next argues that the Superior Court should have granted his repeated requests for a continuance after he fired his third set of counsel and began to represent himself *pro se*. Cooke's argument focuses on the fact that he only had three months from the date the Superior Court granted his request to represent himself until the trial began, and Cooke claims that approximately 90 days was not enough time to review all the evidence and prepare a defense in a capital murder trial. We review the Superior Court's denial of a request for a continuance for abuse of discretion.[82] Requests for a continuance "are left to the discretion of a trial judge whose ruling will not be disturbed on appeal unless that ruling is clearly unreasonable or capricious."[83]

Again, Cooke's argument ignores important context and the several advantages that he had going into his second trial. The hearing on Cooke's request to represent himself was held on November 30, 2011, and Cooke was aware that jury selection for his trial was scheduled to begin on February 20, 2012. By that time, Cooke essentially had been in continuous case preparation mode since his arrest in 2005. Cooke saw the State's case and all of the evidence against him at his first trial in 2007. Cooke knew that he would receive a second trial when this Court reversed his convictions on August 17, 2009, and the Superior Court issued an order on March 10, 2010 that scheduled the

---

[82] *Weber v. State*, 971 A.2d 135, 157 (Del. 2009); *Riley v. State*, 496 A.2d 997, 1018 (Del. 1985); *see also United States v. Valladares*, 544 F.3d 1257, 1261 (11th Cir. 2008); *Jackson v. United States*, 330 F.2d 445, 446 (5th Cir. 1964).

[83] *Bailey v. State*, 521 A.2d 1069, 1088 (Del. 1987); *Hicks v. State*, 434 A.2d 377, 381 (Del. 1981).

second trial for February 22, 2011. That trial was postponed because Cooke filed a lawsuit only two months before the trial against the attorneys who had won his appeal and overturned his conviction, thereby forcing them to withdraw from the case. Thereafter, Cooke worked with his third set of counsel from when they were appointed on March 8, 2011 until he fired them on November 10, 2011. As previously discussed, the Superior Court made special efforts to guarantee that Cooke could have access to all materials and his third set of counsel while he was preparing for the next trial. Cooke's decision to fire the third set of counsel was his own, of course, and may have been unwise. But, Cooke had as a result received advice and input from three sets of experienced defense counsel during the lengthy period since his arrest.

Thus, on November 30, 2011, when engaging in a colloquy with Cooke about his request to represent himself, the Superior Court made clear that it would not grant a continuance to allow Cooke more time to prepare if the request was granted, and Cooke indicated that he understood.[84] Before the Superior Court ruled on Cooke's request, Cooke's third set of counsel suggested that if Cooke were going to represent himself, then the Superior Court should continue the case for one year to allow him to prepare.[85] The Superior Court responded that "whether or not [Cooke] can be prepared is one of the

---

[84] App. to Cooke's Opening Br. at A90-91 ("THE COURT: Do you also understand there will be no continuance of the trial date if you represent yourself? THE DEFENDANT: Yeah, I understand.").

[85] App. to Cooke's Opening Br. at A106.

pitfalls of self-representation."[86] The Superior Court also pointed out that Cooke had

already had an opportunity to see all the evidence against him during the first trial.[87]

Nonetheless, as soon as the Superior Court granted his request to represent himself, the

first thing Cooke did was to ask for a continuance, which the Superior Court denied.[88]

The Superior Court explained to Cooke that merely not being ready to proceed is not a

basis for a continuance.[89]

Then, on January 27, 2012, before the trial started, Cooke again requested a

continuance, arguing that he did not have sufficient time to review all of the materials and

prepare his defense.[90] The Superior Court denied Cooke's request, noting that he had

been advised about the challenges of representing himself.[91] Despite these rulings,

Cooke continued to make requests for a continuance.[92] The Superior Court denied those

requests.[93] On March 7, 2012, the first day of trial, Cooke requested both a mistrial and

that the Superior Court judge recuse himself. The Superior Court denied those requests

and added:

---

[86] App. to Cooke's Opening Br. at A107; *see also* A115 ("Now, if he doesn't wish to use you, that's one of the pitfalls of representing yourself.").

[87] App. to Cooke's Opening Br. at A107-108 ("There's been one trial and he's had counsel go over the records and knows what has to be duplicated. . . . But I have no intention, quite honestly, of continuing the trial of this matter. This offense took place in 2005. It's six years past. This has been known for a while."); A115-116 ("It's been tried once. The evidence is -- whatever exists, exists. And I am more than willing to facilitate whatever you need to have copied or transferred.").

[88] App. to Cooke's Opening Br. at A110-119.

[89] App. to Cooke's Opening Br. at A117-118.

[90] App. to Cooke's Opening Br. at A120.

[91] App. to Cooke's Opening Br. at A120-126; App. to the State's Answering Br. at B20-21.

[92] *See, e.g.*, App. to Cooke's Opening Br. at A56 (motion for continuance on Feb. 1, 2012).

[93] *See, e.g.*, App. to the State's Answering Br. at B30-32 (order denying motion for continuance on Feb.10, 2012).

I will not continue the trial.  I told you that at the start, when you assumed responsibility for your own defense, you would have to meet the same deadlines that I imposed upon counsel.  I know of no conspiracy.  I have no bias against you, one way or the other.  I have decided each issue in accordance with my understanding of the law and arguments of counsel, stand-by, State's counsel, your own argument.[94]

Cooke had four-and-a-half years after his first trial to prepare for his second trial, after having already seen the evidence presented during that first trial.  Cooke also knowingly and voluntarily accepted the difficulties of representing himself in his colloquy with the Superior Court, after being informed of the risks inherent in going forward without counsel, including that the Superior Court would not grant him a continuance.  When Cooke then decided on November 30, 2011 to fire yet another set of counsel and represent himself, he was thus fairly told by the Superior Court that there would be no continuances.[95]  The trial had already been postponed once because of an issue with Cooke's representation.[96]  As it was, Cooke had another three months to

_____

[94] App. to Cooke's Opening Br. at A155-156.

[95] *See Smith v. Lockhart*, 923 F.2d 1314, 1321 (8th Cir. 1991) ("Trial judges must be wary of defendants who employ complaints about counsel as dilatory tactics or for some other invidious motive."); *Bass v. Estelle*, 646 F.2d 1154, 1159 (5th Cir. 1983) ("The freedom to have counsel of one's own choosing may not be used for purposes of delay."); *U. S. ex rel. Davis v. McMann*, 386 F.2d 611, 618 (2d Cir. 1967) ("[A] defendant may not through a deliberate process of discharging retained or assigned counsel whenever his case is called for trial subvert sound judicial administration by such delaying tactics.").

[96] *See Stevenson v. State*, 709 A.2d 619, 631 (Del. 1998) (quoting *U.S. ex rel. Carey v. Rundle*, 409 F.2d 1210, 1214 (3d Cir. 1969) ("The calendar control of modern criminal court dockets . . . is a sophisticated operation constantly buffeted by conflicting forces.  The accused's rights— such as those relating to a speedy trial, to an adequate opportunity to prepare the defense, and to confront witnesses—are constantly in potential or real conflict with the prosecution's legitimate demands for some stability in the scheduling of cases.  The availability of prosecution witnesses is often critically dependent on the predictability of the trial list.  That delays and postponements only increase the reluctance of witnesses to appear in court, especially in criminal matters, is a phenomenon which scarcely needs elucidation."); *Carletti v. State*, 2008 WL 5077746, *5-6

prepare for his second trial, a period during which the Superior Court made certain that Cooke was afforded special privileges — such as a cell to himself to work with his files and special law library access. The Superior Court's refusal to grant a continuance was amply justified by the evidence of record, and there is no plausible basis for Cooke's contention that he was denied an adequate opportunity to prepare for trial.[97]

### 3. Cooke Had A Constitutional Right To Represent Himself, But Cooke Forfeited That Right Through His Contumacious Behavior

As discussed, Cooke elected to exercise his constitutional right to represent himself at his second trial. But on the third day of the State's case-in-chief, the Superior Court terminated Cooke's self-representation and ordered standby counsel to take over Cooke's defense because Cooke had repeatedly defied the Superior Court's instructions to cease his disruptive and inappropriate behavior. Cooke argued in his Opening Brief that the Superior Court deprived him of his constitutional right to represent himself when it terminated his self-representation, because — although Cooke acknowledged that he had been disruptive — "the disruption was caused by the State's interference with his right to prepare, the [Superior] Court's denial of his continuance request[] to properly prepare[,] and the appointment of unwanted stand-by counsel."[98]

Then, in his Reply Brief, Cooke's argument changed. Cooke now concedes that the Superior Court acted within its discretion when it revoked his right to represent

---

(Del. Dec. 3, 2008) (finding that the Court's interest in the need for calendar control, as well as the efficient and effective administration of criminal justice, weighed against a continuance).
[97] *Secrest v. State*, 679 A.2d 58, 64 (Del. 1996) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589-90 (1964)); *Bailey v. State*, 521 A.2d 1069, 1088 (Del. 1987).
[98] Cooke's Opening Brief at 54.

himself.[99]  But, Cooke argues, the Superior Court unreasonably delayed by not revoking

his right to represent himself fast enough, and that the Superior Court should have

substituted standby counsel earlier in the proceedings to minimize the prejudice to him

that was caused by his own misbehavior.  In other words, Cooke's "right of self

representation should have been terminated long before it ultimately was" because

"Cooke's behavior early in the stages of his self representation would have amply

justified the right being revoked at that time."[100]  Cooke also claimed in his Reply Brief

that he did not receive effective assistance of counsel, because during the jury selection

and the first three days of the State's case-in-chief, Cooke's disruptive behavior had

already caused so much harm to his own case that his standby counsel was unable to

represent him adequately.

    This Court reviews the alleged violation of a constitutional right *de novo*.[101]  The

United States and Delaware Constitutions guarantee a defendant the right to represent

himself in a criminal proceeding.[102]  This Court has described the right to represent

oneself as "fundamental."[103]  But, as we have also explained, that right is "not

---

[99] Cooke's Reply Brief at 12.  The Reply Brief also said that, "[t]he record before this Court is replete with examples of Cooke's inappropriate behavior prior to opening statements that would justify revocation of his self representation rights. . . .  The record also reflects several instances of Cooke directing disrespectful, derogatory remarks toward the trial judge when rulings were not in his favor.  Similar remarks were directed toward the State."  Cooke's Reply Brief at 13 (internal citations omitted).
[100] Cooke's Reply Brief at 15.
[101] *Williams v. State*, 56 A.3d 1053 (Del. 2012); *Stigars v. State*, 674 A.2d 477, 479 (Del. 1996); *Grace v. State*, 658 A.2d 1011, 1015 (Del. 1995).
[102] U.S. Const. Amend. VI; Del. Const. Art. I, § 7; *Faretta v. California*, 422 U.S. 806, 812-19 (1975); *Hooks v. State*, 416 A.2d 189, 197 (Del. 1980).
[103] *Stigars v. State*, 674 A.2d 477, 479 (Del. 1996).

24

absolute."[104]  The Superior Court "may terminate self-representation by a defendant who deliberately engages in serious and obstructive misconduct."[105]  In fact, even the defense recognized the Superior Court's "right to terminate *pro se* representation if a defendant refuses to follow court rules or makes it impossible for the proceedings to continue."[106]

The record shows that Cooke demanded to represent himself, and the Superior Court scrupulously respected his right to do so.  On November 30, 2011, the Superior Court held a hearing on Cooke's request to represent himself.[107]  Cooke's counsel said that they had explained to Cooke that they did not believe it was in his best interest to represent himself.  Despite that advice, Cooke said that he wished to represent himself.[108]  In granting Cooke's request, the Superior Court followed the requirements that this Court has articulated to govern requests of this kind.  "[B]efore accepting or rejecting a defendant's motion to proceed *pro se,* the trial judge must determine (1) 'if the defendant has made a knowing and intelligent waiver of right to counsel' and (2) 'inform the

---

[104] *Zuppo v. State*, 807 A.2d 545, 547 (Del. 2002); *see also Martinez v. Court of Appeal of California, Fourth Appellate Dist.*, 528 U.S. 152, 162 (2000) ("A trial judge may also terminate self-representation or appoint 'standby counsel'—even over the defendant's objection—if necessary. . . .  [T]he government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer."); *Clark v. Perez*, 510 F.3d 382, 395 (2d Cir. 2008) ("As it stands, the right to self-representation is not without limits.  The right is not a license to abuse the dignity of the courtroom.") (internal quotation omitted).
[105] *Payne v. State*, 367 A.2d 1010, 1017 (Del. 1976) (quoting *United States v. Faretta*, 422 U.S. 806, 834 (1975)).
[106] Cooke's Opening Brief at 53 (citing *U.S. v. Brock*, 159 F.3d 1077, 1079 (7th Cir. 1998)).
[107] App. to Cooke's Opening Br. at A85.
[108] App. to Cooke's Opening Br. at A86.

defendant of the risks inherent in going forward without the assistance of legal counsel.'"[109]

To make the required finding, the Superior Court conducted a lengthy colloquy with Cooke regarding self-representation.[110] The Superior Court informed Cooke that he would have to conduct his defense in accordance with the Rules of Evidence and Criminal Procedure, even if he was unfamiliar with those Rules.[111] The Superior Court explained that it would be difficult for Cooke to do that, and that Cooke's defense might be hampered by his lack of legal training.[112] Cooke said that he understood. The colloquy between Cooke and the Superior Court continued:

> THE COURT: Do you understand that the right of self-representation is not a license to be disruptive and interrupt trial proceedings and that your behavior and conduct during trial will be held to the same level as that of an attorney?
> THE DEFENDANT: Yes, I understand.
> THE COURT: You must also follow the Court's directions and orders. Do you understand that and agree?
> THE DEFENDANT: Yes, I understand.
> THE COURT: Do you also agree?
> THE DEFENDANT: Yes, I understand and agree.
> THE COURT: Do you understand that the right of self-representation entails a degree of civility and courtesy that must be shown towards the Court and opposing counsel during trial proceedings and that any unsolicited disruptive remarks made or actions taken during the course of the trial will constitute a forfeiture of your right of self-representation?
> THE DEFENDANT: Yes, sir, I understand.
> THE COURT: Do you understand that the Court does not have to advise you of this again and that no further warning need be provided to you? Any disruptive remarks made or actions taken during the course of the trial

---

[109] *Williams v. State*, 56 A.3d 1053, 1055 (Del. 2012) (quoting *Zuppo v. State*, 807 A.2d 545, 547 (Del. 2002)); *Stigars v, State*, 674 A.2d 477, 479 (1996).
[110] App. to Cooke's Opening Br. at A86-102; App. to the State's Answering Br. at B9-18.
[111] App. to Cooke's Opening Br. at A92.
[112] App. to Cooke's Opening Br. at A92-93.

proceedings could constitute a forfeiture of your right to self-representation? Do you understand that this will serve as your last warning, Mr. Cooke? THE DEFENDANT: Yes, I understand.[113]

After the colloquy, the Superior Court granted Cooke's request to represent himself.[114] But the Superior Court also appointed standby counsel to help Cooke prepare his defense and instructed them to be prepared to take over the case if future events necessitated. To ensure that the *pro se* defendant's constitutional rights are secured as much as possible given his choice to act as his own attorney, many courts, including our own, routinely appoint standby counsel to advise the *pro se* defendant if he chooses to listen.[115]

Cooke's effort to act as his own advocate did not proceed smoothly. On March 7, 2012, Cooke made improper comments during his opening statement about his first trial and the Superior Court had to send out the jury.[116] The Superior Court gave Cooke additional instructions, then brought the jury back in and allowed Cooke to finish his opening statement.[117] Cooke also had difficulty cross-examining one of the State's witnesses, but he did accept guidance from the Superior Court and completed his

---

[113] App. to Cooke's Opening Br. at A95-96.

[114] *See Hartman v. State*, 918 A.2d 1138, 1140 (Del. 2007) ("[O]nce a defendant has invoked the right to self-representation that decision must be honored").

[115] *McKaskle v. Wiggins*, 465 U.S. 168, 184 (1984) (trial judge did not violate defendant's right to self-representation by appointing standby counsel over defendant's objection); *Clark v. Perez*, 510 F.3d 382, 395 (2d Cir. 2008) ("[A] judge may qualify it by appointing stand-by counsel, with or without the defendant's consent, to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.") (internal quotation omitted).

[116] App. to Cooke's Opening Br. at A157.

[117] App. to Cooke's Opening Br. at A157-160.

questioning of the witness.[118]  Later, Cooke became frustrated when the Superior Court

informed him that he could not cross-examine one of the State's witnesses as an expert

without first qualifying that witness as an expert.[119]  After Cooke began to argue with the

Superior Court, the Superior Court released the jury for the day and said:

> THE COURT: I will give you a second admonition, I have instructed you to stop doing certain things, you continued, you will add things which are, at best untrue, concerning whatever it is you said or heard, or whatever you said, it has got to stop.  If it does not stop, you will, in the first instance, waive any right to continue to represent yourself, given the egregious nature that been exhibited thus far, you are going a little bit further, you will, perhaps, forfeit that right, which is a second problem.
> …
> I have given you as much leeway as I can.  I have told you how to get past certain objectionable questions, certain run-on sentences, certain use of certain language that no one but you understand, and that's all I can do.  If you don't stop continuing to go past what I have told you to do, then you are going to forfeit that right, as well as waive the right to represent yourself, and that would be unfortunate, given the fact that you made that request.  If you don't stop, it is going to happen.
> …
> Now, if you want to represent yourself, you have to follow the rules of evidence, and rules of Superior Court.  When you don't do that, that creates a problem.  Then you want to add argument beyond that.  I told you to stop that.  So if you continue, then I will revoke your right to represent yourself, and I am telling [counsel] and [counsel], if this continues, then they will become counsel for the defendant . . . .  I have gone as far as I can go.  There is no rancor here.  You have made some intelligent, raised some intelligent issues and questions, but then again, you go further and beyond what the Court has said you can do, consistently said you could do.  You called into question the integrity and credibility of the Court, counsel, and anyone who has been involved in this, who has done something you don't like. . . .  You have to behave and obey the rules of the court.
> …
> I told you where the boundaries are.  If you go beyond that, continue to go beyond that, then I will determine that you can no longer represent yourself.

---

[118] App. to Cooke's Opening Br. at A161-165.
[119] App. to the State's Answering Br. at B147.

You will have forfeited the right. If you go further, you will waive the right to be present, or forfeit the right to be present. I will make the appropriate findings if and when you continue. Please stop, it is unnecessary, and I think we reached a point where you have to do some serious thinking about how you wish to proceed, if you wish to proceed under what circumstances.[120]

On March 8, 2012, Cooke informed the Superior Court that he wished to continue to represent himself and resumed his cross examination of the State's second witness. Cooke's questioning exceeded the scope of the direct, and the State objected.[121] The Superior Court explained that if Cooke had other questions for the witness, then he could call the witness back during his presentation of his case. But Cooke continued to exceed the scope of the direct examination, and the Superior Court sent the jury out.[122] At this point, Cooke told the Superior Court that it was going to hell, and Cooke said that he knew the Superior Court meant to harm him.[123] Cooke also said, "I believe you need to recuse yourself because you're evil, you got so much hatred in you. It's sad."[124] The Superior Court terminated the cross examination of the witness, but decided that it would not revoke Cooke's right to represent himself until there was an opportunity to give the matter more thought, because "what we're trying to do here is to make sure that you get as fair a trial as possible under the circumstances, even if you disagree."[125] The Superior Court warned Cooke, "[i]f your conduct persists in refusing to follow the dictates of the

---

[120] App. to the State's Answering Br. at B147-148.
[121] App. to Cooke's Opening Br. at A177-179.
[122] App. to Cooke's Opening Br. at A192-194.
[123] App. to Cooke's Opening Br. at A197.
[124] App. to Cooke's Opening Br. at A198-199.
[125] App. to Cooke's Opening Br. at A199.

Court, then I will have to act accordingly."[126] The Superior Court took a short recess to allow Cooke to calm down, and the day continued without another incident.

On March 9, 2012, Cooke immediately began to argue with the Superior Court.[127] Later that day, Cooke attempted to cross examine the State's third witness.[128] Cooke continued to make factual arguments and various statements instead of asking the witness questions.[129] The Superior Court sent the jury out, and warned Cooke that:

> THE COURT: The Court . . . has determined that we need to stop these proceedings at this point. Mr. Cooke, I am going so because it appears that you do not wish to abide by the rules and guidelines of this Court. Now, I'm not in a position to argue[] with you, I would like to have you continue to represent yourself, but if you wish not to do so, based upon the guidelines and the instructions given, then I'm going to have no choice but to determine that you forfeited that right. Now, again, and for the last time, I ask you: Do you wish to follow the instructions and guidelines of the Court?
> MR. COOKE: I have always been, Your Honor. I'm just telling the truth. And I believe you hate the truth.[130]

When Cooke continued to argue with the Superior Court, the Court said, "It does not appear to me that you wish to follow those rules and guidelines. Now, that leaves us with what to do next. . . . If you forfeit this right then, it's gone for the balance of the trial. Do you understand that?"[131] Cooke responded, "I understand, Your Honor, you

---

[126] App. to Cooke's Opening Br. at A199-200.
[127] App. to Cooke's Opening Br. at A207-212.
[128] App. to Cooke's Opening Br. at A214.
[129] App. to Cooke's Opening Br. at A214-215.
[130] App. to Cooke's Opening Br. at A217-217a.
[131] App. to Cooke's Opening Br. at A220.

30

forcing me.  I understand you threatening me.  You threatening me not to get a fair

trial."[132]  The exchange continued:

> MR. COOKE: Every time I cross-examine every witness and you see that I
> do the good job, you hear me, either the State jumps up and says objection,
> argumentative, and you step in, you coach along with them, and I'm shut
> down every time.  I'm going to cross-examine the witness, that's all I can do.
> THE COURT: You going to do it your way, I assume?
> MR. COOKE: My way is not the Court way.  I didn't come here as parties.
> I'm not part of the party.  I'm not part of this party.  I'm not a Republican,
> I'm not a Democrat.
> THE COURT: What does that have to do with it?
> MR. COOKE: That's mainly what sits up there, don't it?
> THE COURT: I'm sorry, sir, I don't understand that.
> MR. COOKE: Figure it out.[133]

The Superior Court asked standby counsel whether they would be able to proceed

for the rest of the day, but Cooke objected, saying, "they are not working for me.  I fired

them. . . .  They are not going to represent me.  I fired them.  I'm going to represent

myself."[134]  The Superior Court took a half hour recess, and then it asked for the views of

the State, standby counsel, and Cooke.  Cooke again argued:

> I still deserve to represent myself.  It's nothing I done wrong.  But if you
> chose to overlook that, then I have no choice.  But anything they do is still
> against my will.  I fired them. . . . I do believe I deserve to[] still finish out
> my representation.  And if I do wrong then snatch it.  If I do one more
> thing, then take it from me, but at least allow me to proceed.[135]

Despite Cooke's objections, the Superior Court determined that Cooke had forfeited his

right to represent himself, and instructed standby counsel to take over, saying:

---

[132] App. to Cooke's Opening Br. at A220.
[133] App. to Cooke's Opening Br. at A220-221.
[134] App. to Cooke's Opening Br. at A222-223.
[135] App. to Cooke's Opening Br. at A242-243.

> And I told you before, rudeness and lack of civility would not be tolerated nor would the failure to comply with the rules and dictates of this Court, be tolerated. . . .  I do not wish to do this, but I also believe that unless I do it and reinstate some orderly processes, then this case will get out-of-hand. . . . I find that in the first instance that you forfeited your right to proceed. . . .  I have no -- any other way to get around it.  You have been warned repeatedly.  You have been disrespectful to the Court and counsel.[136]

After a six-day continuance to give standby counsel additional time to prepare, standby counsel assumed control of Cooke's defense.

Because there is ample evidence in the record of Cooke's disorderly conduct, the Superior Court's determination that Cooke had forfeited his right to represent himself through his inappropriate behavior did not violate Cooke's constitutional rights.[137] Cooke refused to follow the Superior Court's orders regarding cross-examining the State's witnesses and did not behave in a civil and courteous manner.[138]  After each instance of Cooke's misconduct, the Superior Court sent the jury out and patiently tried to explain the legal basis for its decisions, while warning Cooke that he risked forfeiting his right to represent himself because the Court would not tolerate disrespectful behavior.

Furthermore, Cooke's new arguments in his Reply Brief — that the Superior Court waited too long to revoke Cooke's right to represent himself and that Cooke could not receive effective assistance of counsel because of the damage he had already done —

---

[136] App. to Cooke's Opening Br. at A244-248.

[137] *United States v. Faretta*, 422 U.S. 806, 834 (1975) ("[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct."); *see also Bultron v. State*, 897 A.2d 758, 765 (Del. 2006) ("If a defendant's behavior is sufficiently egregious, it will constitute forfeiture.").

[138] *Payne v. State*, 367 A.2d 1010, 1017 (Del. 1976) ("Standards required of members of the Bar must be adhered to by defendants undertaking their own defense, and gross deviations from these standards constitute a waiver of the right of self representation.").

are not fairly raised, because they were not made in Cooke's Opening Brief and so the State has had no opportunity to respond to them.[139]  But even if this Court were to consider these new arguments, the record is clear that the Superior Court did not violate Cooke's constitutional rights.  The Superior Court did not, as Cooke suggests, "unreasonably delay[]" in revoking Cooke's right to represent himself;[140] rather, the Superior Court demonstrated tremendous patience and restraint in the face of extremely challenging circumstances, and tried to respect Cooke's right to represent himself for as long as it could.  The Superior Court also repeatedly confirmed that Cooke wanted to continue representing himself, and Cooke insisted that he did.

As the United States Supreme Court has explained, "trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case."[141]  Here, Cooke's conviction and sentence had already been overturned once for not respecting Cooke's constitutional rights regarding his wish to plead not guilty, and the Superior Court was understandably chary of a similar outcome in Cooke's second trial by failing to respect Cooke's desire to represent himself.  Thus, the Superior Court repeatedly confirmed that Cooke wanted to continue representing himself, took extra time to explain its legal rulings, gave Cooke additional instructions, and sent the jury out to minimize any potential prejudice to him.

---

[139] Supreme Court Rule 14(b)(vi)(A)(3) ("The merits of any argument that is not raised in the body of the opening brief shall be deemed waived and will not be considered by the Court on appeal.").
[140] Cooke's Reply Brief at 16.
[141] *Illinois v. Allen*, 397 U.S. 337 (1970).

33

But, at the same time, the Superior Court noted that Cooke seemed to be playing a "cat

and mouse game" in which he was intentionally trying to disrupt the trial to further delay

the proceedings against him.[142]  The Superior Court's apt description applies equally to

Cooke's arguments to this Court, which involve *both* the notion that the Superior Court

erroneously took away Cooke's right to represent himself and the opposite notion that the

Superior Court erred by failing to take away that right earlier.  This approach is

Kafkaesque — but with the twist that it is the citizen who is seeking to ensnare the

government in a capricious web of unfair illogic.[143]  Cooke's attempt to benefit from his

own outrageous and capricious behavior is both inequitable and without basis in the

Constitutions of our nation and our state, particularly where the Superior Court so

conscientiously respected his rights.  To the extent that Cooke did not optimally represent

himself or standby Counsel was compromised in doing so, Cooke's own voluntary

decisions were the cause, not any conduct of the State of Delaware.[144]  Indeed, despite

Cooke's repeated misbehavior, the record reflects that the State of Delaware took

---

[142] App. to Cooke's Opening Br. at A244-248 ("And interestingly enough, Mr. Cooke, you have
kind of played -- and this is my view of it, but I do so find -- kind of a cat and mouse game
where you would go, well, I'll do what you want, yeah, and then something else will happen and
then you'll do something else. . . .  And what it appears to me, for purposes of delay or
disruption, you will say yes one minute, then go back and do something else and the next time a
witness comes through.").
[143] *Cf.* FRANZ KAFKA, THE TRIAL (1925).
[144] *United States v. Allen*, 895 F.2d 1577, 1578 (10th Cir. 1990) ("The right to make a knowing
and intelligent waiver of the right to counsel does not grant the defendant license to play a 'cat
and mouse' game with the court, or by ruse or stratagem fraudulently seek to have the trial judge
placed in a position where, in moving along the business of the court, the judge appears to be
arbitrarily depriving the defendant of counsel.") (internal quotations omitted).

expensive, patient, and time-consuming measures to secure Cooke's right to effective representation.

### 4. The Superior Court's Order That Standby Counsel Should Present Mitigating Evidence Did Not Violate Cooke's Rights Because Cooke's Waiver Of That Right Was Ambiguous And Any Error Was Harmless

Also odd is Cooke's final argument relating to his representation. Cooke argues that his death sentence should be vacated because his attorneys introduced mitigation evidence in an attempt to convince the jury and judge that Cooke should receive a life, not a death sentence. Cooke claims that he unequivocally expressed a desire *not* to present a mitigation case and *not* to oppose the State's arguments in favor of a death sentence. As relief for his counsel's supposed disregard of his desire that his counsel not try their best to preserve his life, Cooke now seeks to have his death sentence lifted.

On appeal, Cooke claims that he waived his right to present mitigating evidence, and that the Superior Court's order directing his standby counsel to present a mitigation case over his objections therefore violated his constitutional right to control his case. Cooke uses as the foundation of his argument the straightforward and logical proposition that in a death penalty case, a defendant has a constitutional right to present mitigating evidence to convince the sentencing authority not to give a death sentence. *Lockett v. Ohio* and many other cases so hold.[145] As this Court has also noted, the right to present mitigating evidence may be waived.[146] Several federal Courts of Appeal have held that

---

[145] *Lockett v. Ohio*, 438 U.S. 586 (1978); *Shelton v. State*, 744 A.2d 465, 495 (Del. 2000).
[146] *Taylor v. State*, 32 A.3d 374, 389 (Del. 2011).

the right to present mitigating evidence may be waived by a defendant,[147] and this Court found those decisions to be "authoritative and persuasive."[148] But the State argues that Cooke did not waive his right clearly and unambiguously.[149] This Court reviews the alleged violation of a constitutional right *de novo*.[150]

To begin with, we are not convinced that a *pro se* criminal defendant who pleads not guilty and is facing a possible death sentence has suffered any cognizable constitutional violation where counsel presents mitigating evidence over his objection. At the very least, we doubt that such an argument can be made by a defendant who is not asking the appellate court to remedy that supposed violation by ordering its logical remedial corollary: that he be subjected to execution as an (admittedly morbid and unusual) form of relief. Where a defendant instead argues that his death sentence should be vacated, the basis for holding that his constitutional rights were violated because mitigating evidence was introduced on his behalf to help him avoid a death sentence seems non-existent and illogical. In this case, the only plausible effect of the mitigation evidence Cooke's counsel submitted was to make it less — not more — likely that Cooke received a death sentence. Because by his appeal Cooke seeks vacation of the death

---

[147] *Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) ("[T]he Constitution does not prohibit a competent capital defendant from waiving the presentation of mitigation evidence."); *Singleton v. Lockhart*, 962 F.2d 1315, 1322-23 (8th Cir. 1992) ("If a defendant may be found competent to waive the right of appellate review of a death sentence, we see no reason why a defendant may not also be found competent to waive the right to present mitigating evidence that might forestall the imposition of such a sentence in the first instance.").

[148] *Taylor v. State*, 32 A.3d 374, 389 (Del. 2011).

[149] State's Answering Brief at 92.

[150] *Flonnory v. State*, 893 A.2d 507, 515 (Del. 2006); *Hall v. State*, 788 A.2d 118, 123 (Del. 2001).

sentence, Cooke essentially admits that by presenting mitigation evidence in an attempt to convince the jury and Superior Court he should not receive the death penalty, standby counsel sought to comply with Cooke's most fundamental wish, namely, to receive the more merciful sentence.

We therefore are unable to fathom the notion of the supposed violation, and even less able to divine how any failure to follow Cooke's ambiguous wishes could have resulted in harm to be remedied. Where a defendant's right to present mitigation evidence is denied, and the defendant receives a death sentence, the harm is obvious.[151] Where, by contrast, the defendant's counsel do their utmost to submit mitigating evidence to obtain a life sentence for a defendant who has pled not guilty, there is no logic to remedying counsel's good faith effort to protect the defendant by vacating his death sentence.

Even if this Court were ever to hold that a defendant in a capital case had a constitutional right to demand that no mitigation evidence be presented on his own behalf, that would first require an unequivocal and unvarying waiver of the defendant's right to present mitigation evidence. A waiver of such a life-determinative right cannot shake or move, or — to draw on the Superior Court's impression of Cooke's behavior —

---

[151] *Williams v. Taylor*, 529 U.S. 362, 393 (2000) (Reversing and remanding a case because "[the defendant] had a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer."); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors."); *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982) ("[T]he state courts must consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances.").

be part of a game of cat and mouse. Where a defendant has forfeited his right to represent himself, he has no constitutional right to direct his counsel how to perform every aspect of their duties.[152]  A great deal of professional discretion remains for counsel, and if the client's fundamental goal is to avoid a death sentence, counsel is required to pursue that end with professional zeal and skill.[153]

Here, Cooke did not unequivocally and unvaryingly waive his right to present mitigation evidence.  Admittedly, the record reflects that Cooke repeatedly stated that he did not wish to present any mitigation evidence at a penalty hearing if he was convicted.[154]  Cooke refused to meet with the mitigation specialist, refused to be tested by any psychologists or psychiatrists, and initially instructed his family not to help with the

---

[152] *New York v. Hill*, 528 U.S. 110, 115 (2000) ("[D]ecisions by counsel are generally given effect as to what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.") (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *Henry v. Mississippi*, 379 U.S. 443, 451 (1965); and *United States v. McGill*, 11 F.3d 223, 226-227 (1st Cir. 1993); *Taylor v. Illinois*, 484 U.S. 400, 417-18 (1988) ("The adversary process could not function effectively if every tactical decision required client approval."); *see also* Am. Bar Ass'n, Criminal Justice Section Standards on Defense Function, Control and Direction of the Case § 5.2(b), *available at* www.americanbar.org/publications/ criminal_justice_section_archive/crimjust_standards_dfunc_blk.html ("Strategic and tactical decisions should be made by defense counsel after consultation with the client where feasible and appropriate. Such decisions include what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and what evidence should be introduced.").

[153] Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* § 10.11, Commentary (rev. ed. 2003) (emphasis added), *reprinted in* 31 Hofstra L.Rev. 913, 1024 (2003), *available at* www.americanbar.org/content/dam/aba/ migrated/2011_build/death_penalty_representation/2003guidelines.authcheckdam.pdf ("Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client."); Am. Bar Ass'n, Model Code of Professional Responsibility, Canon 7-1 (2008) ("The duty of a lawyer, both to his client and the legal system, is to represent his client zealously within the bounds of the law.").

[154] *See, e.g.*, App. to Cooke's Opening Br. at A255, A394-395, A520, A524.

preparation of a mitigation case.[155]  Standby counsel stated multiple times that Cooke told

them that he did not want them to present mitigation evidence.[156]  At one point, Cooke

requested the death penalty.[157]  But, when the Superior Court pointedly asked Cooke if he

was admitting that he had committed Bonistall's rape and murder, Cooke responded, "I

didn't commit anything.  I am an innocent man.  Just give me the death penalty, plain and

simple, Your Honor."[158]  Cooke's answers implied that he did not want to present

mitigation evidence because he thought the proceedings thus far had been unfair, and he

did not think that he could get a fair penalty phase either.[159]  That falls short of

manifesting an unequivocal desire to receive a death sentence.

---

[155] App. to Cooke's Opening Br. at A398-399, A411.

[156] App. to Cooke's Opening Br. at A522.

[157] App. to Cooke's Opening Br. at A397 ("THE DEFENDANT: I am waiving that mitigation.  I told you I waived it.  It is not going to be a fair hearing regards how I look at it.  THE COURT: You don't wish to participate and present any witnesses or evidence?  THE DEFENDANT:  I waive it, because it is not going to mean anything to me.  THE COURT:  I understand you don't wish to participate . . .  THE DEFENDANT:  I am not going to participate.  As a matter of fact, I want the death penalty, Your Honor.  Just give me death.  That's what I deserve.  That's what you want to give me.").

[158] App. to Cooke's Opening Br. at A397.

[159] *See, e.g.*, App. to Cooke's Opening Br. at A394 ("THE COURT: Will you cooperate with [mitigation] witnesses?  MR. COOKE: No.  THE COURT: Sorry?  MR. COOKE: No, sir. I am not cooperating.  I don't.  I didn't do this crime, State know I didn't do this crime.  Those attorneys know I didn't do this crime.  They have full documents, everything.  You denied to hear everything I had to bring in front out of.  Why should I corroborate?  THE COURT: You mean cooperate?  MR. COOKE: Why should I corroborate now to please the State?"); A396 ("THE COURT: Let me ask you a question, Mr. Cooke, because I need to understand.  Basically your position is I don't see any use and any utility in having a penalty phase because the case has been stacked against me from the start.  THE DEFENDANT: Yes.  THE COURT: Let me finish, because I want to make sure I understand this.  And this has been an unfair prosecution and I didn't do it.  I maintain my innocence.  And this jury only convicted me, because I'm innocent, because this was a corrupted function based upon activities, myself, [the original Superior Court judge], the prosecutors, and defense attorneys did.  Correct?  THE DEFENDANT: Yes.  Because I pointed these issues out.  THE COURT: I just want to make sure that's what you're saying.").

Therefore, the Superior Court engaged in a lengthy colloquy with Cooke regarding the presentation of mitigation evidence, and Cooke objected to the presentation of mitigation evidence even though he was informed that it might have negative consequences for his sentence.[160] But the Superior Court ordered counsel to present mitigation evidence because Cooke's objections to the presentation of mitigation evidence appeared to be a result of Cooke's belief that the trial was unfair, rather than a deliberate, merit-based decision to refrain from presenting mitigation evidence.[161] The Superior Court said:

> [T]he defendant has maintained, and I think said it clearly in my estimation, that he did not get a fair trial. He said the same thing consistently. And that as a result of not having had a fair trial he sees no point in presenting the mitigation case, which is far different from . . . recognizing that the State can meet its burden and admitting -- and/or admitting, conceding that the imposition of the death penalty is warranted based upon the facts and circumstances of the case.[162]

Thus, as Cooke acknowledged, "[t]he [Superior Court] held Cooke's desire not to present a mitigation case was born out of frustration for his perceived belief that he did not get a fair trial. Additionally, the [Superior Court] held that his main desire was not to participate in the mitigation case, not that he did not want to present a case."[163] In other words, the Superior Court was not confronted by a genuine acknowledgment by Cooke of

---

[160] App. to Cooke's Opening Br. at A416.
[161] App. to Cooke's Opening Br. at A394 (noting that "this is further continued implementation of [Cooke's] choice of strategy or decision to plead not guilty.").
[162] App. to Cooke's Opening Br. at A398.
[163] Cooke's Opening Brief at 86.

actual guilt and a corollary wish to die, rather than spend his life in prison, as punishment.

Consistent with the Superior Court's conclusion that Cooke had not unequivocally and unvaryingly decided to waive his right to present mitigating evidence during the penalty phase of his case, on April 26, 2012, standby counsel informed the Superior Court that Cooke had agreed to have two of his sons testify and that Cooke was "okay with the majority of the evidence" that standby counsel planned to present during mitigation.[164]  Standby counsel also represented that Cooke was "amenable at this point to letting us get into Joyce Johnson's [Cooke's social worker] testimony on Tuesday . . . as well as the DYFS records and Ms. Connors [the mitigation expert]."[165]  Two of Cooke's children testified that day, and prior testimony by two of his other children was read into the record.[166]  On May 1, 2012, Johnson testified to instances of physical abuse perpetrated on Cooke when he was growing up.[167]  That same day, Connors testified to instances of physical abuse as well as Cooke's family, educational, and medical history up to age 18.[168]  Then, Cooke again changed his mind and objected to the testimony from Connors, but stated that he wished to testify and also to use his opportunity for

---

[164] App. to Cooke's Opening Br. at A418-419.
[165] App. to Cooke's Opening Br. at A419.
[166] App. to the State's Answering Br. at B308-14.
[167] App. to the State's Answering Br. at B321-329.
[168] App. to the State's Answering Br. at B330-345.

allocution.[169]  On May 2, 2012, Cooke testified and said that the mitigation evidence was presented against his wishes.[170]

Because Cooke supported the presentation of mitigation evidence on his behalf during a key period of the penalty proceedings, he effectively nullified his prior opposition to the presentation of mitigating evidence.[171]  That Cooke then shifted again and objected to parts of the mitigating evidence after the fact simply illustrates his lack of consistency and clarity.  The erratic nature of Cooke's statements regarding the mitigation evidence demonstrates that the Superior Court did not err in concluding that Cooke had not unequivocally and unvaryingly waived his right to have mitigation evidence presented on his behalf.[172]  By contrast, at all times, Cooke maintained his innocence, claimed he was being treated unfairly, and sought to be found not guilty.  And at this stage, Cooke is asking this Court to lift his death sentence, a fundamental expression of his desire to obtain a more favorable sentence.  Indeed, had counsel elected not to present mitigation evidence, we have little doubt that Cooke would now be raising

---

[169] App. to the State's Answering Br. at B346.

[170] App. to the State's Answering Br. at B347.

[171] *Cf. Wilson v. Walker*, 204 F.3d 33, 37 (2d Cir. 2000) ("Once asserted, however, the right to self-representation may be waived through conduct indicating that one is vacillating on the issue or has abandoned one's request altogether."); *Williams v. Bartlett*, 44 F.3d 95, 100-01 (2d Cir. 1994) ("The purpose of requiring that a criminal defendant make an 'unequivocal' request to waive counsel is twofold.  First, unless the request is unambiguous and unequivocal, a convicted defendant could have a colorable Sixth Amendment appeal regardless of how the trial judge rules: if his request is denied, he will assert the denial of his right to self-representation; if it is granted, he will assert the denial of his right to counsel.  Second, the requirement of an unambiguous and unequivocal request inhibits any 'deliberate plot to manipulate the court by alternatively requesting, then waiving counsel.') (internal citations omitted).

[172] *See Kostyshyn v. State*, 2004 WL 220321, *2 (Del. Jan. 30, 2004) (finding a series of disruptive, dilatory outbursts was not a "genuine, unequivocal request to proceed pro se").

a claim under *Strickland v. Washington*[173] for ineffective assistance of counsel, and would support that claim by pointing to the same changes of heart that we highlight here.

Although it was not error for the Superior Court to direct standby counsel to present mitigation evidence, we reiterate that any arguable error in having mitigation evidence presented over Cooke's objections was harmless beyond a reasonable doubt.[174] Cooke's standby counsel and the Superior Court were at a peril because of Cooke's shifting position on whether and which types of mitigation evidence to present. When faced with ambiguous directions from a defendant who claimed to be innocent, the Superior Court properly leaned in favor of preserving the defendant's constitutional right to present mitigation evidence to help him avoid a death sentence.[175] Faced with a defendant who had forfeited his right to represent himself though his behavior and who was unclear about his wishes, the prudent course was for counsel to do their utmost to obtain the most favorable sentence possible for their client. The only possible effect of admitting the mitigation evidence over Cooke's objection was to make it less likely that the aggravating factors would outweigh the mitigating circumstances, and thus less likely Cooke would receive the death penalty. Therefore, Cooke suffered no prejudice from any alleged error.

---

[173] 466 U.S. 668 (1984).

[174] *See Van Arsdall v. State*, 524 A.2d 3, 10-11 (Del. 1987) (citing *Chapman v. California*, 386 U.S. 18, 23-24 (1967).

[175] *Cf. Stigars v. State*, 674 A.2d 477, 479 (Del. 1996) ("When faced with an ambiguous request for self-representation, a trial court should lean in favor of the right to counsel.").

**B. Cooke's Contentions That The Superior Court's Rulings Regarding The Admissibility Of Certain Evidence Were Erroneous Are Without Merit**

*1. The Superior Court Properly Excluded Certain Evidence About Bonistall's Prior Sexual Conduct*

At trial, Cooke sought to introduce evidence regarding Bonistall's prior sexual history. That evidence did not involve any prior sexual relationship with Cooke himself. Out of respect for Bonistall and the purposes served by Delaware's Rape Shield Statute,[176] we do not detail the evidence Cooke proffered. Suffice it to say that even if that evidence were true, nothing in the evidence would distinguish Bonistall from tens of millions of other American college students in recent history. The reasons Cooke gave for seeking to introduce this mundane evidence had a clear purpose: Cooke was attempting to show that because Bonistall had consensual sexual relations with other people in the past, that she had consented to sex with Cooke on the night before she was murdered.[177]

But the Superior Court excluded the evidence that Cooke sought to introduce regarding Bonistall's sexual history, finding among other things that the evidence was inadmissible under Delaware's Rape Shield Statute, and apparently also that it failed the basic test of relevance under Delaware Rule of Evidence 401.[178] Cooke challenges the

---

[176] 11 *Del. C.* § 3508 and § 3509.
[177] Cooke's Opening Brief at 65 ("The defense argued that the sex between Bonistall and defendant was consensual."); *see also* App. to Cooke's Opening Br. at A263-264, A370-371.
[178] App. to Cooke's Opening Br. at A265 ("I would deny it under 3508, but I don't even need to reach 3508, at least as to the prior sexual conduct, because it's simply not relevant. Then, if I go to 3508, what is proffered in the affidavit, isn't relevant again, nor is it in any way assisting. . . . [I]t's not relevant, and therefore, it's not admissible, with or without 3508, but in the alternative, with 3508.").

Superior Court's decision to exclude this evidence, on the ground that the Rape Shield Statute does not apply where the alleged victim of the rape is dead and therefore cannot testify at trial.[179] The Superior Court's rulings about whether to admit certain evidence are reviewed for abuse of discretion.[180] For the following reasons, we reject Cooke's arguments and conclude that the Superior Court did not abuse its discretion by excluding the evidence.

As noted, Cooke's reason for introducing this evidence was to buttress his contention that he did not rape and then kill Bonistall, but instead had consensual sex with her on Friday, April 29, 2005, over 24 hours before her murder. Cooke therefore sought to introduce evidence for a purpose that was impermissible as a matter of statute. In a case involving the prosecution of any degree of rape, 11 *Del. C.* § 3509 provides that evidence of a victim's sexual reputation or specific instances of the victim's prior sexual conduct with a person other than the defendant "is *not admissible by the defendant in order to prove consent* by the complaining witness."[181]

Cooke does not contend that our State's Rape Shield Statute, which is similar to that which exists in many American states, is unconstitutional.[182] Rather, Cooke argues that the Rape Shield Statute does not apply because Bonistall was murdered, and a dead

---

[179] Cooke's Opening Brief at 65; Cooke's Reply Brief at 18.

[180] *Richardson v. State*, 43 A.3d 906, 911 (Del. 2012) (citing *Harris v. State*, 991 A.2d 1135, 1138 (Del. 2010).

[181] 11 *Del. C.* § 3509(a).

[182] Cooke's Reply Brief at 18 ("Cooke never challenged the statute itself . . ."). "In cases involving the validity of rape shield statutes, the courts have been confronted with a number of different constitutional issues, but, almost without exception, have upheld the particular statute involved." Joel E. Smith, *Constitutionality of "rape shield" statute restricting use of evidence of victim's sexual experiences*, 1 A.L.R.4th 283 (1980).

victim cannot be a "complaining witness" under the Statute. That off-putting argument

uses as its premise one of the fundamental purposes of a Rape Shield Statute, which is to

ensure that victims of rape are not discouraged from coming forward by facing a threat

that intimate details of their prior sexual history will be exposed to the community in a

public trial.[183] Cooke claims that because a dead victim cannot testify, there is no reason

to apply the statute to exclude the evidence in that circumstance. In other words, Cooke

argues that so long as the person alleged to have been a victim of rape has been killed, the

defendant accused of the rape may use evidence of the victim's prior sexual conduct or

reputation to prove that the deceased consented to having sex with him.

Cooke's argument lacks merit. First and most important, Cooke ignores the

statutory definition of a "complaining witness," which is clear on its face. A

"complaining witness" is defined as "the alleged victim of any degree of rape . . ." and its

---

[183] *Jenkins v. State*, 2012 WL 3637236, at *2-3 (Del. Aug. 23, 2012) (quoting *Scott v. State*, 642 A.2d 767, 771 (Del. 1994)) (the purpose of Delaware's Rape Shield Law is "to allow defenses based on the complainant's credibility while protecting [the complainant] from unnecessary humiliation and embarrassment" thus "ensur[ing] the cooperation of victims of sexual offenses"); *see also Vance v. State*, 384 S.W.3d 515, 519 (Ark. 2011) ("The purpose of the rape-shield statute is to shield victims of rape or sexual abuse from the humiliation of having their sexual conduct, unrelated to the charges pending, paraded before the jury and the public when such conduct is irrelevant to the defendant's guilt."); *State v. Alberts*, 722 N.W.2d 402, 409 (Iowa 2006) ("[T]he purpose of the rape-shield law . . . is to protect the victim's privacy, encourage the reporting and prosecution of sex offenses, and prevent the parties from delving into distractive, irrelevant matters."); *State v. Garron*, 827 A.2d 243, 254 (N.J. 2003) ("The overarching purpose of the Rape Shield Statute is to protect the privacy interests of the victim while ensuring a fair determination of the issues bearing on the guilt or innocence of the defendant."); *State v. Lynch*, 854 A.2d 1022, 1035 (R.I. 2004) ("The rape shield statute was enacted to encourage victims to report crimes without fear of inviting unnecessary probing into the victim's sexual history.") (internal quotation marks omitted).

applicability is not limited to living victims.[184]  The statutory language is itself dispositive

and defeats Cooke's argument.[185]  But, even if the statutory language were ambiguous,

we would not embrace Cooke's reading of the Rape Shield Statute.  There is no reason to

believe that the General Assembly's concern that alleged rape victims should not be

subjected to general character assassination extends only to living victims and not to

those who also paid the ultimate price of losing their life.  As a policy matter, Cooke's

argument would create a perverse incentive, whereby a rapist who killed his victim would

be advantaged over one who let his victim live.  For these reasons, arguments like

Cooke's have been largely rejected by other state courts, which have found that their

Rape Shield Statutes apply regardless of whether the alleged victim of the rape is alive or

dead.[186]  We agree with those well-reasoned decisions.  Cooke's own counsel repeatedly

---

[184] 11 *Del. C.* § 3508(b); *see also* 11 *Del. C.* § 3509(e) (defining "complaining witness" as "the alleged victim of the crime charged, the prosecution of which is subject to this section").

[185] *Kelty v. State Farm Mutual Auto Ins. Co.*, 73 A.3d 926, 929 (Del. 2013) ("When interpreting a statute, we attempt to determine and give effect to the General Assembly's intent.  We give unambiguous statutory language its plain meaning unless the result is so absurd that it cannot be reasonably attributed to the legislature.").

[186] *See, e.g.*, *Hobson v. State*, 675 N.E.2d 1090, 1093 (Ind. 1996) ("[A] victim's death does not abrogate the public policy advanced by the Rape Shield Statute, *inter alia*, encouraging victims to report rape."); *Jenkins v. State*, 627 N.E.2d 789, 795 (Ind. 1993) ("If the statute is not applied to victims who ultimately are murdered, then perpetrators of sex crimes will be encouraged to kill their victims, thus enabling them to defend the charges through exploitation of evidence of the victim's prior sexual activity."); *Holland v. State*, 587 So. 2d 848, 863 (Miss. 1991) ("[The defendant] contends that [the rape shield law] has nothing to do with relevancy because it was 'designed [solely] to protect the privacy of a [*living* ] victim'—*not* a *dead* victim . . . .  Common sense dictates that [the defendant's] contention is meritless."); *State v. Clowney*, 690 A.2d 612, 619 (N.J. Super. Ct. App. Div. 1997) ("We find nothing in the language of the statute, or its underlying purposes, to suggest a deceased victim's prior sexual conduct is less protected than a living victim's.  Beyond that, we find it irrational and illogical to suggest that the rape shield law should be made inapplicable when the victim is killed after a rape.  The statutory goals of protecting the privacy of the victim and seeking to avoid character assassination are no less

acknowledged that the purpose of the evidence was to demonstrate the Bonistall had

consented to sex with Cooke. The Superior Court's exclusion of the evidence was

therefore proper under § 3509, as it was being offered for the improper purpose of

proving consent.[187]

On a related point, the Superior Court's ruling may also fairly be read as grounded

in, not only § 3509 itself, but also a more general determination that the evidence Cooke

sought to admit was not relevant.[188] We say that not only because the Superior Court's

ruling is somewhat ambiguous on the point, but also because § 3509 is fundamentally a

legislative determination of relevance.[189] The basic test of relevance is whether the

---

consequential when the rape victim is killed. A deceased rape victim's life is entitled to the same privacy as a surviving victim's."); *State v. Craig*, 853 N.E.2d 621, 636 (Ohio 2006) ("No part of the rape shield law suggests that a deceased victim's sexual history is less protected than that of a living victim. . . . [T]he state interests underlying the rape shield law are not eliminated when the victim has died."); *State v. Turner*, 2001 WL 605153 (Tenn. Crim. App. June 5, 2001) (The fact that the victim died does not affect the application of [Tennessee's rape shield law]."); *Hoke v. Com.*, 377 S.E.2d 595, 599 (Va. 1989) (applying Virginia's Rape Shield Law to preclude the admission of evidence about the past sexual history of a victim who was murdered after a rape).
[187] *See, e.g.*, *Ketchum v. State*, 1989 WL 136970, at *2-3 (Del. Oct. 17, 1989) (holding that evidence about the victim's prior sexual conduct, including affidavits from three men stating that the victim would have sex while intoxicated and wake up disoriented and unaware of the events of the previous night, was inadmissible under § 3509 if proffered to show consent.").
[188] App. to Cooke's Opening Br. at A264.
[189] *See, e.g.*, Harriett R. Galvin, *Shielding Rape Victims in the State and Federal Courts: A Proposal for the Second Decade*, 70 MINN. L. REV. 763, 798 (1986) ("More compelling . . . was the claim by rape-shield proponents that the changing moral climate in this country simply invalidated the underpinnings of the common-law doctrine, rendering unchastity evidence irrelevant for its stated purposes."); Tanya Bagne Marcketti, *Rape Shield Laws: Do They Shield the Children?*, 78 IOWA L. REV. 751, 754 (1993) ("Rape shield statutes evolved from society's recognition that a rape victim's prior sexual history is irrelevant to issues of consent . . . ."). Other commentators have considered statutes like § 3509 to constitute a legislative determination that this evidence, if possibly of marginal relevance, is barred under a balancing test akin to exclusion under Rule of Evidence 403. *See, e.g.*, Clifford S. Fishman, *Consent, Credibility, and the Constitution: Evidence Relating to A Sex Offense Complainant's Past Sexual Behavior*, 44 CATH. U. L. REV. 709, 722 (1995) ("Such legislation represents a legislative judgment that

proffered evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[190] At its most mundane level, § 3509 recognizes that sex is a common part of human life.[191] That a person consented to sex with someone other than the defendant on a prior occasion is a human act so ordinary that it cannot be regarded as making it more likely than not that she consented to having sex on a particular occasion with the defendant now accused of her rape.

In an attempt to avoid exclusion by § 3509, Cooke submitted a motion and affidavit requesting to admit the evidence of Bonistall's sexual history under § 3508. Evidence of a complaining witness's prior sexual history may be admitted "to attack the credibility of the complaining witness," but "only when the statutory procedure in [§ 3508] is followed and the court determines that the evidence proposed to be offered by the defendant regarding the sexual conduct of the alleged victim is relevant."[192] Cooke's affidavit contained no rational articulation of how the proffered evidence compromised

---

evidence of a complainant's prior sexual conduct is only marginally relevant and that, barring unusual circumstances, it tends to confuse the issues, unduly harass witnesses, and may also be unfairly prejudicial to the prosecution.") (internal quotation omitted).

[190] Delaware Rule of Evidence 401.

[191] *See* The Kinsey Institute, *Frequently Asked Sexuality Questions*, www.iub.edu/~kinsey/resources/FAQ.html (last updated July 21, 2012) (90% of men and 86% of women surveyed reported having had sex in the last year); Delaware Rule of Evidence 201(b) (judicial notice may be taken of a fact "not subject to reasonable dispute").

[192] *Wright v. State*, 513 A.2d 1310, 1314-15 (Del. 1986). 11 *Del. C.* § 3508 requires a defendant to "make a written motion to the court and prosecutor stating that the defense has an offer of proof concerning the relevancy of evidence of the sexual conduct of the complaining witness which the defendant proposes to present, and the relevancy of such evidence in attacking the credibility of the complaining witness" and accompany it with "an affidavit in which the offer of proof shall be stated."

Bonistall's credibility, or why her credibility was even at issue. The Superior Court did not abuse its discretion in excluding the evidence under § 3508.

### 2. The Superior Court Did Not Abuse Its Discretion By Allowing Lay Opinion Testimony From A Police Officer That It Was Cooke's Voice On The 911 Calls

Following the murder, an anonymous person made three calls to the police 911 call center. In the first call on May 2, 2005, the caller said that the Harmon, Cuadra, and Bonistall crimes were all related.[193] In two additional calls on May 7, 2005, the caller gave detailed information about the three crimes, including information that had not been previously released to the public.[194] The calls convinced the police that the crimes were linked and had been committed by the same person. Recordings of these 911 calls were admitted into evidence.

After listening to the tapes, Cooke's girlfriend, Rochelle Campbell, testified that she was 100 percent certain that the voice on all of the 911 calls was Cooke.[195] But the State also wanted Detective Rubin to present lay opinion testimony that he recognized the voice on the calls as Cooke's voice. Detective Rubin had interviewed Cooke, face to face, for four to six hours after he was arrested, and throughout the investigation and during the extensive proceedings before the second trial, Detective Rubin had heard Cooke speak in person for tens of hours, and thus was familiar with Cooke's voice.[196]

---

[193] App. to the State's Answering Br. at B256-57.
[194] App. to Cooke's Opening Br. at A542-46; App. to the State's Answering Br. at B257, B264.
[195] App. to Cooke's Opening Br. at A325-27.
[196] App. to Cooke's Opening Br. at A337.

50

Cooke's counsel objected to Detective Rubin's lay opinion testimony about the identity of the voice on the 911 calls, but the Superior Court decided to allow it.

The Superior Court's rulings about whether to admit certain evidence are reviewed for abuse of discretion.[197] Delaware Rule of Evidence 701 permits lay witness testimony in the form of opinions that are: "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue and (c) not based on scientific, technical or other specialized knowledge within the scope of rule 702."[198] Thus, Rule 701 "permits a lay witness to testify about his own impressions when they are based on personal observation."[199] But the ultimate question of the identity of the voice remains one for the jury to decide,[200] and lay opinion testimony will not be helpful to the jury "when the jury can readily draw the necessary inferences and conclusions without the aid of the opinion."[201]

Cooke argues that Detective Rubin was no better suited than the jury to make the judgment at issue. The jury had listened to the recordings of the calls, watched a videotaped portion of Cooke's post-arrest interview, and heard Cooke speak in court. The State contends that Detective Rubin was much more familiar with Cooke's voice

---

[197] *Richardson v. State*, 43 A.3d 906, 911 (Del. 2012) (citing *Harris v. State*, 991 A.2d 1135, 1138 (Del. 2010).

[198] Delaware Rule of Evidence 701. Additionally Delaware Rule of Evidence 901(b)(5) permits the "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

[199] *Washington v. State*, 945 A.2d 1168 (Del. 2008).

[200] *Vouras v. State*, 452 A.2d 1165, 1169 (Del. 1982).

[201] *United States v. Sanabria*, 645 F.3d 505, 515 (1st Cir. 2011).

than the jury, and that his testimony was therefore helpful.[202]  Because there was a basis in the record for the Superior Court to find that Detective Rubin was more familiar with Cooke's voice than the jury because of, among other things, his extensive face-to-face interview with Cooke, and thus, that his testimony would be helpful, the Superior Court did not abuse its discretion in admitting the testimony.[203]

In any event, the admission of Rubin's lay opinion testimony was harmless.[204]  As explained, the jury was required to and was instructed to make its own determination about this factual question, and there is no rational basis to believe that the jury did not do that here, or that the jury was somehow unduly influenced by Detective Rubin's brief testimony on this point.  Furthermore, an error in admitting evidence may be deemed to be "harmless" when "the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction."[205]  Putting aside the jury's own ability to listen to the calls and decide that it was Cooke's own voice on them, the jury also had other lay opinion evidence besides that provided by Detective Rubin.  Campbell — Cooke's girlfriend and mother of four of his children — also testified that she was 100 percent sure that the voice on the 911 calls was Cooke's.  Because Campbell's testimony provided a sufficient basis for the jury to conclude that Cooke had made the 911 calls

---

[202] App. to Cooke's Opening Br. at A321.

[203] *See, e.g.*, *United States v. Cruz-Rea*, 626 F.3d 929, 935 (7th Cir. 2010); *United States v. Gholikhan*, 370 F. App'x 987, 991 (11th Cir. 2010); *United States v. Zepeda-Lopez*, 478 F.3d 1213, 1221 (10th Cir. 2007).

[204] *Van Arsdall v. State*, 524 A.2d 3, 10 (Del. 1987) ("[T]his Court has consistently refused to reverse convictions for errors found to be harmless.").

[205] *Nelson v. State*, 628 A.2d 69, 77 (Del. 1993) (quoting *Johnson v. State*, 587 A.2d 444, 451 (Del. 1991)).

even without Detective Rubin's lay opinion testimony any error by the Superior Court in admitting the evidence was harmless.

### C. Cooke's Right To An Impartial Jury Was Not Compromised

#### 1. The Superior Court's Refusal To Declare A Mistrial Because Of Inappropriate Comments By A Potential Juror Who Was Not Selected Was Not An Abuse Of Discretion

Cooke also argues that his right to an impartial jury was compromised because the Superior Court did not declare a mistrial when evidence came to light that a potential juror had made racist statements to other potential jurors at lunchtime during the jury selection process. The issue surfaced when another potential juror, Joan Reeder, told her neighbor about hearing the inappropriate remarks. The neighbor was employed as a bookkeeper at a law firm, and the neighbor told an attorney at the law firm what Reeder had said, and the attorney reported it to the Superior Court on February 29, 2012.[206]

The Superior Court investigated to determine whether juror misconduct had occurred. Reeder had been excused from jury service on February 21, 2012, the second day of jury selection, and the potential juror who made the comments was excused that day as well. The Superior Court brought the attorney and the neighbor in to testify about what they had been told.[207] The Superior Court also brought Reeder back to testify about what she had heard and try to determine the identity of the potential juror who had made the comments. Reeder stated:

---

[206] App. to the State's Answering Br. at B83-84.
[207] App. to the State's Answering Br. at B93-94.

MS. REEDER: Yes. We were in the cafeteria and he spouted off and everybody at the table got up and left and went and sat at other chairs. And he was just -- that's all, to me, he was doing was spouting off.
THE COURT: When you say he was spouting off, what did he say?
MS. REEDER: He was saying how prejudiced he was and I'm going to tell that judge that since the guy is black and he did it anyway -- and that's all I meant was spouting off. And I thought to myself . . . how dumb are you?[208]

Reeder added:

MS. REEDER: And he sat and boasted about how he was prejudice[d]. And he has a daughter and, you know, it was just unnecessary remarks.
THE COURT: He didn't say anything about the merits of the case, just that he thought that the defendant did it?
MS. REEDER: He was going to say he did it anyway.
THE COURT: Just to get out from -- just to --
MS. REEDER: Yeah.[209]

Reeder identified the potential juror as William Wilson. At Cooke's request, Wilson was brought in to answer questions regarding his comments.[210] Wilson said that he could not remember exactly what he said but admitted it was possible that he had said something.[211] Cooke moved for a mistrial, and the Superior Court denied the motion.[212] The Superior Court said that when the jury was empaneled, it would "make sure that no one has had any conversations and ask[] them if they have had any conversations with anyone or there have been any expressions of a predetermination of guilt of the defendant or any indication of ethnic or [racial] bias or prejudice against this defendant."[213]

---

[208] App. to Cooke's Opening Br. at A131.
[209] App. to Cooke's Opening Br. at A134.
[210] App. to Cooke's Opening Br. at A137-38.
[211] App. to Cooke's Opening Br. at A143.
[212] App. to Cooke's Opening Br. at A135; A152.
[213] App. to Cooke's Opening Br. at A152.

54

This Court reviews the Superior Court's denial of a request for a mistrial based on alleged juror misconduct for abuse of discretion.[214] This Court also reviews the Superior Court's "decision on the 'mode and depth of investigative hearings into allegations of juror misconduct' and on the remedy for such misconduct for abuse of discretion."[215] "In the juror misconduct context, however, a defendant is entitled to a new trial 'only if the error complained of resulted in actual prejudice or so infringed upon defendant's fundamental right to a fair trial as to raise a presumption of prejudice.'"[216] "A trial judge should grant a mistrial only where there is 'manifest necessity' or the 'ends of public justice would be otherwise defeated.'"[217]

Cooke argues that Wilson's inappropriate statements "may have influenced potential jurors" and tainted the entire process.[218] But, a claim of juror misconduct must focus on the jurors who were actually seated, not those who were excused.[219] Both Reeder and Wilson were excused, so the misconduct was not committed by a seated

---

[214] *Durham v. State*, 867 A.2d 176, 177 (Del. 2005) (citing *Barriocanal v. Gibbs*, 697 A.2d 1169, 1171 (Del. 1997)).

[215] *Caldwell v. State*, 780 A.2d 1037, 1058 (Del. 2001) (quoting *Massey v. State*, 541 A.2d 1254, 1257 (Del. 1998); *see also Lovett v. State*, 516 A.2d 455, 475 (Del. 1986) ("The Trial Judge has very broad discretion in deciding whether a case must be retried or the jurors summoned and investigated due to alleged exposure to prejudicial information or improper outside influence.").

[216] *Durham v. State*, 867 A.2d 176, 179 (Del. 2005) (quoting *Hughes v. State*, 490 A.2d 1034, 1043 (Del. 1985)); *see also Capano v. State*, 781 A.2d 556, 645 (Del. 2001) (quoting *Massey v. State*, 541 A.2d 1254, 1255 (Del. 1988) ("To impeach a jury verdict because of juror misconduct, 'a defendant must establish actual prejudice unless defendant can show that the circumstances surrounding the misconduct were so egregious and inherently prejudicial as to support a presumption of prejudice to defendant.'")).

[217] *Steckel v. State*, 711 A.2d 5, 11 (Del. 1998) (quoting *Fanning v. Superior Court*, 320 A.2d 343, 345 (Del. 1974).

[218] Cooke's Opening Brief at 47.

[219] *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988).

juror. Furthermore, there is no evidence of record that any of the seated jurors were improperly influenced by Wilson's comments, which were of a generically offensive racist kind and did not involve statements suggesting that Wilson possessed case-specific evidence about Cooke's culpability. Perhaps for that reason, Cooke has not even alleged that he suffered any actual prejudice as a result of the comments. Thus, the Superior Court did not abuse its discretion in denying Cooke's motion for a mistrial.

## 2. *The Superior Court Did Not Abuse Its Discretion When It Dismissed Juror #10 For Inappropriate Conduct*

Cooke next contends that the Superior Court abused its discretion by removing a juror, Juror #10, for repeated misbehavior. Cooke claims that the Superior Court's real reason for removing Juror #10 was because of her views about the evidence presented, and that in excusing Juror #10, the Superior Court "stripped [Cooke] of a juror of his choosing."[220] This Court reviews the Superior Court's decision to excuse a juror for abuse of discretion.[221]

The record does not support Cooke's argument. On March 26, 2012, Juror #10 arrived late, and her tardiness delayed the start of the trial. Juror #10 had been late several times before.[222] When Juror #10 arrived, the Superior Court reprimanded her and instructed her to be on time in the future.[223] Later that morning, the State pointed out that Juror #10 "doesn't seem to be totally engaged in the process and at times is literally

---

[220] Cooke's Opening Brief at 49.
[221] *Capano v. State*, 781 A.2d 556, 644 (Del. 2001); *Johnson v. State*, 311 A.2d 873, 874 (Del. 1973); *see also United States v. Bertoli*, 40 F.3d 1384, 1392 (3d Cir. 1994).
[222] App. to the State's Answering Br. at B258.
[223] App. to Cooke's Opening Br. at A319.

looking away and seems agitated."[224]  That afternoon, the State said that they had noticed

that Juror #10 was "muttering under her breath" during sidebars and "rocking back and

forth."[225]  Cooke's counsel said that "[t]he only thing I've noticed, Your Honor, is I don't

think she's buying the State's case and that's why the State wants to get rid of her."[226]

The Superior Court took no action at that time because it did not think it had a basis to,

but would "continue to watch it."[227]

On March 29, 2012, the jurors went on a site visit to see the apartments in

Newark, Delaware that had been burglarized.  During the visit, Juror #10 yelled and

cursed at one of the bailiffs because she thought he was treating her unfairly when he

would not let her smoke.[228]  The State raised other concerns about Juror #10, including

that she would not follow the bailiff's instructions to stay with the group during the site

visit, and that she had attempted to ask the investigating officer a substantive question,

which was against the Superior Court's explicit instructions.[229]  The State then asked for

---

[224] App. to Cooke's Opening Br. at A320.

[225] App. to Cooke's Opening Br. at A328; App. to the State's Answering Br. at B272.

[226] App. to Cooke's Opening Br. at A328.

[227] App. to Cooke's Opening Br. at A328.

[228] App. to Cooke's Opening Br. at A339-340 ("She got all mad.  Fuck, you know, all kind of curse words, stomping her feet, waving her hands, totally upset. . . .  Then once we got off the elevator on the eighth floor, she was "F" this and "F" that.  This is bullshit, waiving her hands in the air. . . .  She started yelling at me, saying this was bullshit. . . . And . . . she apparently called me a fucking idiot."); A341 ("She started stomping her feet, waving her hands, saying this is bullshit and, you know, I want to fucking smoke.  This is -- just ranting and raving basically about not being able to smoke all the way. . . .  But as she was going in, I believe she was like, well, I'll just be late for everything then.  She's been consistently late pretty much every day.").

[229] App. to Cooke's Opening Br. at A340.

Juror #10 to be removed. After hearing testimony from the bailiff and Juror #10 about the incident, the Superior Court excused Juror #10.[230]

Because there is ample evidence in the record to support its conclusion that Juror #10 should be excused due to her inappropriate conduct and not because of her views of the evidence, the Superior Court did not abuse its discretion by dismissing her. Furthermore, when the Superior Court questioned each of the remaining jurors to determine whether Juror #10's behavior or her excusal would affect their ability to give fair and impartial consideration to the issues in the case, the remaining jurors indicated that they would be able to proceed unaffected.[231]

### 3. The Superior Court's Refusal To Declare A Mistrial For Inaccurate Answers Given By Juror #3 During Voir Dire Was Not An Abuse Of Discretion

Cooke's final argument relating to the composition of the jury is that the Superior Court erred by failing to excuse a juror who gave inaccurate information in response to *voir dire* questions. Cooke says that had that juror given accurate answers, he would have attempted to strike her, and that the juror's failure to answer accurately thus deprived him of a fair jury. To address this claim fairly, the factual background must first be recited in some detail.

---

[230] App. to Cooke's Opening Br. at A346 ("[S]he has been late, consistently late. And that in and of itself doesn't bother me. But I just see a disruptive influence. And her behavior and conduct is such that I wouldn't take it from an attorney and I wouldn't take it from a party and I'm not going to take it from her. I, therefore, reluctantly and over your objection and Mr. Cooke's objection . . . I'm going to excuse her.").

[231] App. to Cooke's Opening Br. at A346-53.

During the jury selection process, the Superior Court asked ten preliminary questions to the jury array. Then individual *voir dire* questioning began. When Luz Rodriguez (who eventually became "Juror #3") presented on February 21, 2012, she was asked, "Have you, a relative, or close friend ever been a witness of, or a victim of a violent crime?"[232] Juror #3 responded that two of her nephews had been killed ten years ago in Philadelphia. Further questioning revealed that the perpetrators had been convicted and sentenced to life in prison. Juror #3 was also asked, "Have you, a relative, or close friend ever been charged with, or convicted of a criminal offense?"[233] Juror #3 said no. Juror #3 was also asked, "Are you, a relative, or close friend presently under investigation or prosecution by any law enforcement agency for any criminal offense?"[234] Juror #3 said no. Juror #3 said that on a scale from one to ten, she was a seven in favor of the death penalty.[235] Juror #3 also disclosed that she had been a juror twice before, in a robbery trial and an attempted murder trial, and both juries had given guilty verdicts.[236] Neither Cooke nor the State challenged Juror #3 for cause or used a peremptory challenge to strike her, and she was seated as a member of the jury.

After the jury returned guilty verdicts against Cooke on all but one misdemeanor theft charge, the penalty hearing began on April 18, 2012. During the penalty hearing, on April 25, 2012, Juror #3 received a notice in the mail that she had been summoned as a

---

[232] App. to Cooke's Opening Br. at A129.
[233] App. to Cooke's Opening Br. at A129.
[234] App. to Cooke's Opening Br. at A129.
[235] App. to Cooke's Opening Br. at A128.
[236] App. to Cooke's Opening Br. at A129.

witness in a Family Court hearing that was scheduled for May 7, 2012. The next day, on April 26, 2012, Juror #3 told the bailiff about the summons.[237] The bailiff brought the issue to the attention of the Superior Court.

The Superior Court questioned Juror #3, and she explained that on December 18, 2011, she witnessed an altercation between her husband, Jose Acevedo (the "Husband"), and her twenty-year old daughter, Valerie Cotto (the "Daughter"), who lived with them. The Husband made a negative comment to the Daughter, the exchange escalated to name-calling, and then the Daughter threatened the Husband with a kitchen knife.[238] The grandchildren were present, so Juror #3 took them upstairs. A few minutes later, Juror #3 heard the Husband calling her name. When Juror #3 returned to the kitchen, she saw the Daughter on the floor and the Husband holding the Daughter by the neck. Juror #3 told the Husband to let the Daughter go, and when he did, the Daughter called the police. The Husband told Juror #3 that after she left, the Daughter hit him twice with a frying pan.[239] The Husband said that he had grabbed the Daughter only to prevent her from hitting him again. Juror #3 believed him and felt that he had only held the Daughter by the neck in order to stop her from assaulting him.

Nonetheless, the police arrested the Husband, and he spent the night in jail, but Juror #3 posted his bail the next day.[240] The Husband was initially charged with strangulation, menacing, and three counts of endangering the welfare of a child. Those

---

[237] App. to Cooke's Opening Br. at A420.
[238] App. to Cooke's Opening Br. at A424.
[239] App. to Cooke's Opening Br. at A425.
[240] App. to Cooke's Opening Br. at A425.

charges were reduced to two misdemeanors for offensive touching and menacing. But the Daughter repeatedly informed Juror #3 that she had dropped all charges voluntarily.[241]

On April 11, 2012, the day the jurors were to be sequestered, the Husband carried Juror #3's luggage to the courthouse and told her that he had to go to a hearing that day.[242] Juror #3 went with him to the hearing because the Husband does not speak much English, and she discovered that the charges had not been dropped. Juror #3 called the Daughter to ask what was going on, and the Daughter said that she "told them [she] didn't want to press charges against him."[243] Juror #3 told the Superior Court that she did not inform it about the situation at that time because, after talking to the Daughter, she thought that the charges would be dropped. Juror #3 did not know that the charges had not been dropped until she received the witness summons in the mail.

The Superior Court asked Juror #3 whether the incident created any problems with her participation in the case, and whether it would cause her to treat the State differently than the Defense. Juror #3 answered "no" to both questions.[244] After discussion with counsel, the Superior Court concluded that it did not have enough information to make a determination about whether the incident had impaired or would impair Juror #3's ability to be impartial. The Superior Court called Juror #3 back for a hearing on April 27, 2012. Juror #3 provided additional information about the incident and answered questions from

---

[241] App. to Cooke's Opening Br. at A425-426.
[242] App. to Cooke's Opening Br. at A426.
[243] App. to Cooke's Opening Br. at A427.
[244] App. to Cooke's Opening Br. at A421.

the Superior Court. The Superior Court asked Juror #3 multiple times whether the incident affected her vote in the case or negatively affected her ability to be fair and impartial, and Juror #3 answered, "Not at all."[245]

The Superior Court asked Juror #3 why she did not say during *voir dire* that she had been a witness to a violent crime. Juror #3 responded that the question did not cause her to think about the incident with the Daughter, "[b]ecause based on what I saw I never felt that he tried to kill her. The way that I saw it, he [was] just trying to stop her from hitting him with a frying pan."[246] The Superior Court asked Juror #3 why she did not say during *voir dire* that a relative had been charged with a criminal offense. Juror #3 said that "because my daughter had told me that she withdraw the charges against him, my answer was no" and that she considered the charges by her daughter to be "a false claim."[247] The Superior Court asked Juror #3 why she did not say during *voir dire* that a relative was under investigation. Juror #3 said that "because [the Daughter] had already told me that she withdr[e]w the charges, then I thought there was no investigation going on."[248] The Superior Court asked whether Juror #3 thought that hitting the Husband was a violent act. Juror #3 said, "No. I mean, it's violence, but I wasn't thinking about that incident when I answered that question" because "[i]t was a family thing."[249]

---

[245] App. to Cooke's Opening Br. at A428-29.
[246] App. to Cooke's Opening Br. at A427.
[247] App. to Cooke's Opening Br. at A431.
[248] App. to Cooke's Opening Br. at A431.
[249] App. to Cooke's Opening Br. at A431.

The Husband's case was prosecuted by the Family Division of the Delaware

Department of Justice, and the prosecutor represented to the Superior Court that the

Family Court unit was entirely separate from the unit tasked with prosecuting felony

trials in the Superior Court.[250]  Juror #3 did not know the prosecutor or defense attorney

involved in the Husband's case and had not met them.[251]

Cooke's counsel then moved for a mistrial,[252] which the Superior Court denied

after hearing arguments.[253]  The Superior Court remarked that "I don't have someone

who's being disingenuous"[254] and then concluded:

> I did find her -- she was inaccurate [i]n her answers, but she was honest.  I do
> not believe she meant to deceive.  I think, in her mind, she explained why she
> answered what she answered.  The [Defense] has a view of whether she
> would have been struck or not have been struck, but at this point I do not find
> the error, A, to be intentional and, B, to be of such a dimension that it would
> result in a fundamental injustice to the defendant.[255]

The Superior Court then had to determine whether to remove Juror #3 and replace her

with an alternate for the sentencing hearing.  The State argued that Juror #3 should be

removed because it was concerned that she would be biased against the State.[256]  But the

defense argued that Juror #3 should remain on the panel, stating that "if you find that she

was fair enough to render a verdict of guilty, she's fair enough to sit on the penalty

---

[250] App. to Cooke's Opening Br. at A432.
[251] App. to Cooke's Opening Br. at A427.
[252] App. to Cooke's Opening Br. at A433.
[253] App. to Cooke's Opening Br. at A440.
[254] App. to Cooke's Opening Br. at A434.
[255] App. to Cooke's Opening Br. at A440.
[256] App. to Cooke's Opening Br. at A440-41.

phase."[257] The State noted that the next alternate juror said that on a scale from one to ten, he was a ten in favor of the death penalty, whereas Juror #3 was only a seven.[258] The Superior Court determined that Juror #3 would stay on the panel and would not be excused. On May 21, 2012, the defense filed a motion for a new trial, based on the grounds of juror bias and misconduct, specifically the issue with Juror #3's inaccurate answers to the *voir dire* questions.[259] On July 24, 2012, the Superior Court issued a 38-page decision denying the motion for a new trial.[260]

Cooke now claims that if Juror #3 had answered the *voir dire* questions accurately, then he would have challenged her for cause or exercised a peremptory challenge.[261] Cooke also claims that the Superior Court's failure to remove Juror #3 or to declare a mistrial deprived him of trial by an impartial jury, and that he should be entitled to a new trial as a result. This Court reviews the Superior Court's refusal to grant a motion for a new trial for abuse of discretion.[262]

The Constitutions of our nation and our state guarantee a criminal defendant the right to have his case heard by an impartial jury.[263] The right to challenge a potential juror during *voir dire* is an important safeguard of the right to trial by an impartial jury,

---

[257] App. to Cooke's Opening Br. at A441-42.
[258] App. to Cooke's Opening Br. at A442.
[259] App. to Cooke's Opening Br. at A467.
[260] App. to Cooke's Opening Br. at A478; *see also State v. Cooke*, 2012 WL 3060956 (Del. Super. July 24, 2012).
[261] Cooke's Opening Brief at 42.
[262] *Taylor v. State*, 685 A.2d 349, 350 (Del. 1996); *Massey v. State*, 541 A.2d 1254, 1257 (Del. 1988).
[263] U.S. Const. Amend. VI; Del. Const. Art. I, § 7; *Flonnery v. State*, 778 A.2d 1044, 1052 (Del. 2001).

and that right can be compromised when a juror fails to disclose material information.[264] The purpose of *voir dire* is to provide the Superior Court and the parties with "sufficient information to decide whether prospective jurors can render an impartial verdict based on the evidence developed at trial and in accordance with the applicable law."[265] This Court has held that "if only one juror is improperly influenced, a defendant in a criminal case is denied his Sixth Amendment right to an impartial jury."[266]

In addressing what consequences should follow when jurors have failed to answer material questions during *voir dire* accurately, the law distinguishes between situations where a juror's failure to answer accurately was deliberate, rather than inadvertent. Where a juror *deliberately* fails to answer honestly a material question during *voir dire*, that dishonesty is considered to be, in itself, sufficient evidence of bias to require that the defendant be afforded a new trial.[267] By contrast, to determine whether a new trial must be held in cases involving *inadvertent* non-disclosure by a juror, this Court has adopted the standard set by the United States Supreme Court in *McDonough Power Equipment Inc. v. Greenwood*.[268] *McDonough* held that to obtain a new trial, a defendant must demonstrate both that "a juror failed to answer honestly a material question on *voir dire*," and that "a correct response would have provided a valid basis for a challenge for

---

[264] *Jackson v. State*, 374 A.2d 1, 2 (Del. 1977).
[265] *Hughes v. State*, 490 A.2d 1041 (Del. 1985) (citing *Parson v. State*, 275 A.2d 777, 780 (Del. 1971)).
[266] *Hall v. State*, 12 A.3d 1123 (Del. 2010).
[267] *Schwan v. State*, 65 A.3d 582, 591 (Del. 2013); *Jackson v. State*, 374 A.2d 1, 2 (Del. 1977).
[268] 464 U.S. 548 (1984); *Banther v. State*, 783 A.2d 1287, 1290-91 (Del. 2001).

65

cause."[269] This Court has held that "[d]uring jury selection in a capital murder case, the answer to a question about violent crime is material."[270] Thus, Cooke has established that the relevant questions posed to Juror #3 were material.

The Superior Court's assessment of a juror's honesty during *voir dire* is entitled to "special deference."[271] This deference is "based upon the judge's ability to assess the veracity and credibility of the potential juror."[272] Here, the Superior Court concluded that Juror #3's answers to the *voir dire* questions were inadvertently inaccurate, rather than purposefully untrue.[273] The Superior Court also found that Juror #3's explanations were "candid and credible,"[274] and that Juror #3's *voir dire* answers were an "honest statement or belief made in good faith."[275]

The record adequately supports the Superior Court's conclusion that Juror #3's incomplete answers to the *voir dire* questions resulted from an honest mistake. Juror #3 plausibly explained why the Superior Court's question about witnessing a violent crime

---

[269] *Schwan v. State*, 65 A.3d 582, 591 (Del. 2013); *Banther v. State*, 783 A.2d 1287, 1290–91 (Del. 2001).

[270] *Banther v. State*, 783 A.2d 1287, 1291 (Del. 2001), *see also Sampson v. United States*, 724 F.3d 150, 165 (1st Cir. 2013) ("[A] voir dire question is material if a response to it 'has a natural tendency to influence, or is capable of influencing,' the judge's impartiality determination.").

[271] *Patton v. Yount*, 467 U.S. 1025, 1038 (1984); *DeShields v. State*, 534 A.2d 630, 636 (Del. 1987) ("Determinations of juror impartiality are the responsibility of the trial judge who has the opportunity to question the juror, observe his or her demeanor, and evaluate the ability of the juror to render a fair verdict.").

[272] *Schwan v. State*, 65 A.3d 582, 589 (Del. 2013); *Hughes v. State*, 490 A.2d 1034, 43 (Del. 1985) ("[I]t is the judge who is best situated to determine competency to serve impartially.").

[273] App. to Cooke's Opening Br. at A507 ("There is no indication that Juror No. 3 was intentionally deceptive at any point in her responses to the voir dire, in bringing the matter to the attention of the Court or in testifying before Court about her involvement in the . . . matter.").

[274] App. to Cooke's Opening Br. at A508.

[275] App. to Cooke's Opening Br. at A438.

66

did not cause her to think about the ambiguous event between the Husband and the

Daughter. Juror #3 testified that she viewed her Husband as defending himself against

the Daughter's attacks with a knife and a frying pan. Juror #3 also explained that she did

not think that the Husband was charged with, or was under investigation for, a crime

because she believed that the Daughter had dropped the charges. Although Cooke argued

that the Superior Court erred by accepting Juror #3's explanation, the Superior Court's

decision to do so was within its discretion and resulted from a very thorough factual

inquiry. Supporting its finding was the fact that Juror #3 herself surfaced the issue,

belying the notion that Juror #3 had somehow purposely hid the issue so as to further

some desire on her part to serve as a juror in Cooke's trial.

Because the Superior Court had a sufficient basis to conclude that Juror #3's

answers were not intentionally false, we need not reach the second prong of *McDonough*

— the question of whether the record also supports the Superior Court's conclusion that

Cooke would not have had a basis to strike Juror #3 for cause even if she had more

accurately answered the *voir dire* questions. Put simply, Juror #3's honest but mistaken

answers to the *voir dire* questions do not amount to a violation of Cooke's constitutional

rights that would entitle him to a new trial.[276] As the United States Supreme Court

---

[276] *See Smallwood v. State*, 2002 WL 31883015 (Del. Dec. 26, 2002); *see also United States v. Hodge*, 321 F.3d 429, 441 (3d Cir. 2003) ("Generally, we will not invalidate a jury's verdict because of a juror's mistaken, though honest, response at *voir dire*."); *United States v. Ortiz*, 942 F.2d 903, 909 (5th Cir. 1991) ("Moreover—and much more important—[the juror]'s post-verdict dialogue with the district court suggests that he answered the *voir dire* query honestly yet inaccurately, something *McDonough Power Equipment Co.* expressly permits."); *Arreola v. Choudry*, 533 F.3d 601, 608 (7th Cir. 2008) (quoting *McDonough*).

explained in *McDonough*, "[t]o invalidate the result of a [multi]-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give."[277]

## D. Imposition Of The Death Penalty Does Not Fail A Proportionality Review

This Court is statutorily mandated to conduct a specific form of judicial review following the imposition of a death sentence. Under 11 *Del. C.* § 4209(g), this Court must review a sentence of death to determine whether: (1) the evidence supports, beyond a reasonable doubt, the jury's finding of at least one statutory aggravating circumstance; (2) the sentence was arbitrarily or capriciously imposed or recommended; and (3) the sentence is disproportionate to the penalty imposed in similar cases.[278]

Cooke argues that his death sentence in this case fails a proportionality review, because it is "disproportionate to the penalty recommended in similar cases."[279] Cooke also claims that "the trial process and the penalty phase were so flawed as to deny him Due Process so that a proportionality review for this case would be impossible."[280] Cooke claims that the conviction and sentence are "manifestly unjust and [] so lacking in reliability that it renders such analysis useless."[281] As explained above, Cooke's complaints about the trial process and the penalty phase do not have merit, and thus they do not render the required proportionality review impossible or useless.

---

[277] *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984).
[278] *Sykes v. State*, 953 A.2d 261, 273 (Del. 2008), *Pennell v. State*, 604 A.2d 1368 (Del. 1992).
[279] Cooke's Opening Brief at 95 (citing 11 *Del. C.* § 4209(g)(2)(a)).
[280] Cooke's Opening Brief at 97.
[281] Cooke's Opening Brief at 98.

We also conclude that Cooke's alternative argument that the sentence entered against him does not survive the statutory review process lacks merit.

First, the evidence in the record supports the jury's finding that there was no reasonable doubt that a statutory aggravating factor existed because Bonistall's murder was committed while Cooke was engaged in the commission of, or attempt to commit, one of the enumerated felonies in 11 *Del. C.* § 4209(e)(1)(j). The jury convicted Cooke of first degree rape and first degree burglary. Because Cooke was properly convicted of those crimes by the jury on sufficient evidence, the statutory aggravating circumstance was established as a matter of law.[282]

Next, the Superior Court did not arbitrarily or capriciously impose the death penalty. A trial court's decision is arbitrary and capricious only if the decision is not "the product of a deliberate, rational and logical deductive process."[283] Here, the Superior Court set out its rationale for the sentencing decision in a detailed 70-page written opinion.[284] The Superior Court identified several nonstatutory factors alleged by the State, including the gruesome circumstances of Bonistall's murder, the other home invasions and violent crimes that Cooke committed in Newark and in Atlantic City around the same time as Bonistall's murder, and Cooke's 25-year criminal history. In reaching its decision, the Superior Court also carefully considered the mitigating evidence presented by Cooke's standby counsel, including the abandonment and abuse in

---

[282] *Dawson v. State*, 627 A.2d 57, 66 (Del. 1994).

[283] *Manley v. State*, 918 A.2d 321, 329 (Del. 2007) ((quoting *Red Dog v. State*, 616 A.2d 298, 310 (Del. 1992)).

[284] *See* Sentencing Decision, Exhibit B to Cooke's Opening Brief (Sept. 17, 2012).

his childhood, Cooke's affection for his family, and the impact his execution would have on his children. Then, after reviewing these factors, the Superior Court made a reasoned determination that the mitigating factors were outweighed by the aggravating factors. Because the Superior Court's decision was the result of rational thinking that cannot be described as arbitrary and capricious, we are bound to defer to it.[285]

Finally, Cooke's sentence is not disproportionate to the penalty imposed in similar cases. To determine if a death sentence is disproportionate, the Court reviews the universe of cases,[286] which is comprised of those First Degree Murder cases that have included a penalty hearing and in which a sentence of either life or death has become final,[287] without or following a review by this Court.[288] A definitive comparison of cases is "almost impossible."[289] "The fact that there is only one statutory aggravating factor in this case does not make imposition of the death penalty disproportionate."[290]

The task of conducting a proportionality review under § 4209(g) has a necessarily uncomfortable quality, because determining whether a crime that ended in someone's death is more or less condemnable involves a decisionmaking process that can never be wholly objective or untroubling. But this is not a close case. Burglarizing an occupied

---

[285] *Red Dog v. State*, 616 A.2d 298, 309 (Del. 1992).
[286] *See* Appendix A.
[287] *Capano v. State*, 781 A.2d 556, 677-78 (Del. 2001).
[288] *Sykes v. State*, 953 A.2d 261, 273 (Del. 2008).
[289] *Clark v. State*, 672 A.2d 1004, 1010 (Del. 1996).
[290] *Capano v. State*, 781 A.2d 556, 677-78 (Del. 2001).

home in the early morning hours is more than sufficiently terrorizing to the victim.[291]

Binding,[292] brutally beating, raping, and strangling the innocent and defenseless victim,[293] and then dousing her dead body in bleach and burning it in an attempt to destroy evidence of the crime is — by any minimal standard of human decency — horrific and depraved conduct, which renders the perpetrator eligible for a sentence of death under clear precedent interpreting the Constitutions of our state and our nation.[294]  Therefore, the Superior Court was justified in finding that "[t]he evidence presented at trial leads to the inescapable conclusion that the murder of Lindsey Bonistall was committed in an unusually cruel and depraved fashion."[295]  Accordingly, this case easily fits the pattern of cases where the death penalty has been upheld as proportionate.

## IV.  CONCLUSION

For all of these reasons, the judgment of the Superior Court is AFFIRMED.

---

[291] *See, e.g.*, *Swan v. State*, 820 A.2d 342, 360 (Del. 2003) ("[T]he home [is] one place where a person should feel secure from the elements that may place their family at risk.").
[292] *See, e.g.*, *Dawson v. State*, 637 A.2d 57, 68 (Del. 1994) (noting that "Dawson's murder victim, like those of *Red Dog* and *Pennell*, was rendered helpless by binding before her death" when concluding that Dawson's death sentence was proportionate).
[293] *See, e.g.*, *Steckel v. State*, 711 A.2d 5, 14 (Del. 1998) (affirming death sentence where defendant attacked, strangled, and raped his helpless victim).
[294] *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 437-38 (2008) (distinguishing between intentional first-degree murder and other serious violent crimes, and determining that although the death penalty is constitutional for murder, "the death penalty should not be expanded to instances where the victim's life was not taken") *Tison v. Arizona*, 481 U.S. 137, 158 (1987) (death penalty is constitutional in a felony murder case where the defendant was a major participant in the felony committed and the defendant acted with reckless indifference to human life); *Dawson v. State*, 637 A.2d 57, 67-68 (Del. 1994) (death penalty was constitutional where the defendant "was found guilty of committing an unprovoked, cold-blooded murder of a person who lacked the ability to defend herself").
[295] Sentencing Decision, Exhibit B to Cooke's Opening Brief (Sept. 17, 2012) at 48.

**APPENDIX A**<sup>*</sup>

Name:                Robert Ashley
Criminal ID:         9605003410
County:              New Castle
Sentence:            Life imprisonment (following retrial and second penalty hearing)
Decision on appeal:  2006 WL 797894 (Del. Mar. 27, 2006)

Name:                Meri-Ya C. Baker
Criminal ID:         90011925DI
County:              New Castle
Sentence:            Life imprisonment
Decision on appeal:  1993 WL 557951 (Del. Dec. 30, 1993)

Name:                Jermaine Barnett
Criminal ID:         9506017682
County:              New Castle
Sentence:            Life imprisonment (following second penalty hearing)
Decision on appeal:  749 A.2d 1230 (Del. 2000) (remanding for new sentencing)

Name:                Hector S. Barrow
Criminal ID:         9506017661
County:              New Castle
Sentence:            Life imprisonment (following second penalty hearing)
Decision on appeal:  749 A.2d 1230 (Del. 2000) (remanding for new sentencing)

Name:                Tyreek D. Brown
Criminal ID:         9705011492
County:              New Castle
Sentence:            Life imprisonment
Decision on appeal:  1999 WL 485174 (Del. Mar. 1, 1999)

---

<sup>*</sup>The universe of cases prior to 1991 is set forth in appendices to prior opinions by this Court, and those appendices are incorporated herein by reference. *See, e.g.*, *Lawrie v. State*, Del. Supr., 643 A.2d 1336, 1352-56 (1994).

Name:                    Justin L. Burrell
Criminal ID:             9805012046
County:                  Kent
Sentence:                Life imprisonment
Decision on appeal:      766 A.2d 19 (Del. 2000)

Name:                    Luis G. Cabrera
Criminal ID:             9703012700
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      747 A.2d 543 (Del. 2000)

Name:                    Luis G. Cabrera
Criminal ID:             9904019326
County:                  New Castle
Sentence:                Death
Decision on appeal:      840 A.2d 1256 (Del. 2004)

Name:                    James B. Clark, Jr.
Criminal ID:             9406003237
County:                  New Castle
Sentence:                Death (judge only)
Decision on appeal:      672 A.2d 1004 (Del. 1996)

Name:                    Charles M. Cohen
Criminal ID:             90001577DI
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      No direct appeal taken

Name:                    Donald Cole
Criminal ID:             0309013358
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      922 A.2d 364 (Del. 2007)

Name:                    James T. Crowe, Jr.
Criminal ID:             9508008979
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      1998 WL 736389 (Del. Oct. 8, 1998)

Name:                    David F. Dawson
Criminal ID:             88K00413DI
County:                  New Castle (venue changed)
Sentence:                Death
Decision on appeal:      637 A.2d 57 (Del. 1994)

Name:                    Byron S. Dickerson
Criminal ID:             90011926DI
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      1993 WL 541913 (Del. Dec. 21, 1993)

Name:                    Cornelius E. Ferguson
Criminal ID:             91009926DI
County:                  New Castle
Sentence:                Death
Decision on appeal:      642 A.2d 772 (Del. 1994)

Name:                    Donald Flagg
Criminal ID:             9804019233
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      No direct appeal taken

Name:                    Freddy Flonnory
Criminal ID:             9707012190
County:                  New Castle
Sentence:                Life imprisonment (following second penalty hearing)
Decision on appeal:      893 A.2d 507 (Del. 2006)

Name:                  Sadiki J. Garden
Criminal ID:         9912015068
County:            New Castle
Sentence:          Life imprisonment ordered on appeal
Decision on appeal:   844 A.2d 311 (Del. 2004)

Name:                  Robert J. Garvey
Criminal ID:         0107010230
County:            New Castle
Sentence:          Life imprisonment
Appeal:             873 A.2d 291 (Del. 2005)

Name:                  Robert A. Gattis
Criminal ID:         90004576DI
County:            New Castle
Sentence:          Death (death sentence commuted in 2012)
Decision on appeal:   637 A.2d 808 (Del. 1994)

Name:                  Arthur Govan
Criminal ID:         92010166DI
County:            New Castle
Sentence:          Life imprisonment
Decision on appeal:   1995 WL 48359 (Del. Jan. 30, 1995)

Name:                  Tyrone N. Guy
Criminal ID:         0107017041
County:            New Castle
Sentence:          Life imprisonment
Decision on appeal:   913 A.2d 558 (Del. 2006)

Name:                  Jason Anthony Hainey
Criminal ID:         0306015699
County:            New Castle
Sentence:          Life imprisonment
Appeal:             878 A.2d 430 (Del. 2005)

Name:              Ronald T. Hankins
Criminal ID:       0603026103A
County:            New Castle
Sentence:          Life imprisonment
Decision on appeal: 976 A.2d 839 (Del. 2009)

Name:              Akbar Hassan-El
Criminal ID:       010701704
County:            New Castle
Sentence:          Life imprisonment
Decision on appeal: 911 A.2d 385 (Del. 2006)

Name:              Robert W. Jackson, III
Criminal ID:       92003717
County:            New Castle
Sentence:          Death
Decision on appeal: 684 A.2d 745 (Del. 1996)

Name:              Larry Johnson
Criminal ID:       0309013375
County:            New Castle
Sentence:          Life imprisonment
Decision on appeal: 878 A.2d 422 (Del. 2005)

Name:              Shannon Johnson
Criminal ID:       0609017045
County:            New Castle
Sentence:          Death
Decision on appeal: 983 A.2d 904 (Del. 2009)

Name:              David Jones
Criminal ID:       9807016504
County:            New Castle
Sentence:          Life imprisonment
Decision on appeal: 798 A.2d 1013 (Del. 2002)

Name:                    Michael Jones
Criminal ID:             9911016309
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      940 A.2d 1 (Del. 2007).

Name:                    Michael Keyser
Criminal ID:             0310021647
County:                  Kent
Sentence:                Life imprisonment
Decision on appeal:      893 A.2d 956 (Del. 2006)

Name:                    David J. Lawrie
Criminal ID:             92K03617DI
County:                  Kent
Sentence:                Death
Decision on appeal:      643 A.2d 1336 (Del. 1994)

Name:                    Thomas M. Magner
Criminal ID:             9509007746
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      1998 WL 666726 (Del. July 29, 1998)

Name:                    Michael R. Manley
Criminal ID:             9511007022
County:                  New Castle
Sentence:                Death
Decision on appeal:      918 A.2d 321 (Del. 2007)

Name:                    Frank W. Moore, Jr.
Criminal ID:             92S03679DI
County:                  Sussex
Sentence:                Life imprisonment
Decision on appeal:      1994 WL 202289 (Del. May 9, 1994)

Name:                    Adam Norcross
Criminal ID:             0002006278A
County:                  Kent
Sentence:                Death
Decision on appeal:      816 A.2d 757 (Del. 2003)

Name:                    Juan Ortiz
Criminal ID:             0107004046A
County:                  Kent
Sentence:                Death
Decision on appeal:      869 A.2d 285 (Del. 2005)

Name:                    Darrel Page
Criminal ID:             9911016961
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      934 A.2d 891 (Del. 2007)

Name:                    James W. Perez
Criminal ID:             93001659
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      No. 207, 1993, Moore, J. (Del. Feb. 3, 1994)

Name:                    Gary W. Ploof
Criminal ID:             0111003002
County:                  Kent
Sentence:                Death
Decision on appeal:      75 A.3d 840 (Del. 2013)

Name:                    Derrick Powell
Criminal ID:             0909000858
County:                  Sussex
Sentence:                Death
Decision on appeal:      49 A.3d 1090 (Del. 2012)

| | |
|---|---|
| Name: | James Allen Red Dog |
| Criminal ID: | 91001754DI |
| County: | New Castle |
| Sentence: | Death (judge only) |
| Decision on appeal: | 616 A.2d 298 (Del. 1992) |

| | |
|---|---|
| Name: | Luis Reyes |
| Criminal ID: | 9904019329 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 819 A.2d 305 (Del. 2003) |

| | |
|---|---|
| Name: | James W. Riley |
| Criminal ID: | 0004014504 |
| County: | Kent |
| Sentence: | Life imprisonment (following retrial) |
| Decision on appeal: | 2004 WL 2085525 (Del. Oct. 20, 2004) |

| | |
|---|---|
| Name: | Jose Rodriguez |
| Criminal ID: | 93001668DI |
| County: | New Castle |
| Sentence: | Life imprisonment |
| Decision on appeal: | 1994 WL 679731 (Del. Nov. 29, 1994) |

| | |
|---|---|
| Name: | Richard Roth, Jr. |
| Criminal ID: | 9901000330 |
| County: | New Castle |
| Sentence: | Life imprisonment |
| Decision on appeal: | 788 A.2d 101 (Del. 2001) |

| | |
|---|---|
| Name: | Reginald N. Sanders |
| Criminal ID: | 91010161DI |
| County: | New Castle (venue changed) |
| Sentence: | Life imprisonment (following 1992 resentencing) |
| Decision on appeal: | 585 A.2d 117 (Del. 1990) (remanding for new sentencing) |

Name:                    Nelson W. Shelton
Criminal ID:             92000788DI
County:                  New Castle
Sentence:                Death
Decision on appeal:      652 A.2d 1 (Del. 1995)


Name:                    Donald J. Simmons
Criminal ID:             92000305DI
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      No direct appeal taken


Name:                    Chauncey Starling
Criminal ID:             0104015882
County:                  New Castle
Sentence:                Death (on two counts)
Decision on appeal:      903 A.2d 758 (Del. 2006)


Name:                    Brian David Steckel
Criminal ID:             9409002147
County:                  New Castle
Sentence:                Death
Decision on appeal:      711 A.2d 5 (Del. 1998)


Name:                    David D. Stevenson
Criminal ID:             9511006992
County:                  New Castle
Sentence:                Death
Decision on appeal:      918 A.2d 321 (Del. 2007)


Name:                    Willie G. Sullivan
Criminal ID:             92K00055
County:                  Kent
Sentence:                Death
Decision on appeal:      636 A.2d 931 (Del. 1994)

Name:                    Ralph Swan
Criminal ID:             0002004767A
County:                  Kent
Sentence:                Death
Decision on appeal:      820 A.2d 342 (Del. 2003)

Name:                    Ambrose L. Sykes
Criminal ID:             04011008300
County:                  Kent
Sentence:                Death
Decision on appeal:      953 A.2d 261 (Del. 2008)

Name:                    Antonio L. Taylor
Criminal ID:             9404018838
County:                  Kent
Sentence:                Life imprisonment
Decision on appeal:      685 A.2d 349 (Del. 1996)

Name:                    Emmett Taylor, III
Criminal ID:             0708020057
County:                  Sussex
Sentence:                Death
Decision on appeal:      28 A.3d 399 (Del. 2011)

Name:                    Milton Taylor
Criminal ID:             0003016874
County:                  New Castle
Sentence:                Death
Decision on appeal:      822 A.2d 1052 (Del. 2003)

Name:                    Desmond Torrence
Criminal ID:             0205014445
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      2005 WL 2923501 (Del. Nov. 2, 2005)

Name:                    Charles H. Trowbridge
Criminal ID:             91K03044DI
County:                  Kent
Sentence:                Life imprisonment
Decision on appeal:      1996 WL 145788 (Del. Mar. 4, 1996)

Name:                    James W. Virdin
Criminal ID:             9809015552
County:                  Kent
Sentence:                Life imprisonment
Decision on appeal:      780 A.2d 1024 (Del. 2001)

Name:                    John E. Watson
Criminal ID:             91008490DI
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      No direct appeal taken

Name:                    Dwayne Weeks
Criminal ID:             92010167
County:                  New Castle
Sentence:                Death
Decision on appeal:      653 A.2d 266 (Del. 1995)

Name:                    Joseph Williams
Criminal ID:             9809018249
County:                  New Castle
Sentence:                Life imprisonment
Decision on appeal:      2003 WL 1740469 (Del. Apr. 1, 2003)

Name:                    Roy R. Williamson
Criminal ID:             93S02210DI
County:                  Sussex
Sentence:                Life imprisonment
Decision on appeal:      669 A.2d 95 (Del. 1995)

Name:                  Craig A. Zebroski
Criminal ID:           9604017809
County:                New Castle
Sentence:              Death
Decision on appeal:    715 A.2d 75 (Del. 1998)